**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**
**THIRD DIVISION**

---

Schwan's Sales Enterprises, Inc., Court File No. 01-SC-263 JNE/AJB

Plaintiff and
Counterclaim Defendant,

vs.
SIG Pack, Inc., Doboy Division,
Defendant and
Counterclaim Plaintiff.

---

**AFFIDAVIT OF PAUL E.D. DARSOW IN SUPPORT OF MEMORANDUM OF SIG PACK, INC., DOBOY DIVISION IN OPPOSITION TO THE MOTION OF SCHWAN'S SALES ENTERPRISES, INC., TO AMEND THE JUDGMENT**

---

STATE OF MINNESOTA )
)ss.
COUNTY OF HENNEPIN )

**PAUL E.D. DARSOW**, being first duly sworn and upon oath, states and deposes:

1. That your affiant is the attorney for Plaintiff and Counterclaim Defendant SIG Pack, Inc., Doboy Division in the above-entitled matter.

2. That this Affidavit is submitted in support of Plaintiff and Counterclaim Defendant's Memorandum in Opposition to the Motion of Schwan's Sales Enterprises, Inc. to Amend the Judgment.

3. That attached hereto as Exhibit A is a true and correct copy of the Doboy Proposal.

4. That attached hereto as Exhibit B is a true and correct copy of an unpublished decision by the United States District Court for the District of Minnesota in Netwig v. Georgia-Pacific Corp., 2002 WL 391354 (D.Minn. Mar. 11, 2002).

4. That attached hereto as Exhibit C is a true and correct copy of an unpublished decision by the Minnesota Court of Appeals in Lakehead Electric Company v. Lakehead Pipe Line Company, Inc., 1993 WL 515821 (Minn.App. Dec. 14, 1993).

5. That attached hereto as Exhibit D is a true and correct copy of an unpublished decision by the United States District Court for the District of Minnesota in Ferris Baker Watts, Inc. v. Deutsche Bank Securities Ltd., 2004 WL 2501563 (D.Minn. Nov. 5, 2004).

6. That attached hereto as Exhibit E is a true and correct copy of an unpublished decision of the United States District Court for the District of Minnesota in Children's Broadcasting Corporation v. The Walt Disney Company, 2002 WL 1858759 (D.Minn. Aug. 12, 2002).

**FURTHER YOUR AFFIANT SAITH NOT.**

Paul E.D. Darsow

Subscribed to and sworn before me
this 12th day of January, 2006.

Notary Public

KATHLEEN AMORE ADOFO
NOTARY PUBLIC-MINNESOTA
My Commission Expires Jan. 31, 2010

# EXHIBIT A

## DOBOY PROPOSAL

SIG Pack Inc. Doboy Division / 869 South Knowles Ave. New Richmond, WI 54017 / Tel: (715) 246 6511 Fax: (715) 246 6539

SIG pack

Ex. 84

November 20, 1998

Mr. Marion Dome
SCHWAN'S SALES ENTERPRISES
3019 Scanlan Avenue
Salina, KS 64701-8198

Fax: 785/822-2508

Dear Marion:

I offer the following amendment to Proposal No. 853502-764.

Doboy agrees to ship the packaging system as described in Proposal No. 853502-764 priced at $756,610.00 on May 14, 1999.

Doboy further agrees to credit $2,500.00 to Schwan's for each calendar day of delay if the machinery is shipped after May 14, 1999.

Doboy and Schwan's will meet on November 30, 1998 to come to a mutual agreement on the system specifications. Any changes to specifications after this meeting will result in a change of ship date without invokement of the delay charges.

Doboy will not acknowledge responsibility for delays created by Schwan's including, but not limited to:

1. Receipt of down payment and specifications by 1 December 1998.
2. Receipt of packaging materials.
3. Receipt of product samples.
4. Receipt of test samples.
5. Customer design approvals.
6. Design or specification changes.
7. Customer factory acceptance checkout.
8. Delayed progress payments.
9. Acts of God, warfare, labor unrest, etc....

Marion, I thank you for your interest in Doboy packaging equipment and look forward to a long and mutually beneficial relationship.

Best regards,

Terry Palmer
Account Manager – Wrappers

na

EXHIBIT
A

SSE 001672

SIG Pack Inc.
Doboy Division
869 South Knowles Ave.
New Richmond, WI 54017
Tel: (715) 246 6511
Fax: (715) 246 6536

SIG pack

# PROPOSAL #853502-764

SCHWAN'S SALES ENTERPRISES
3019 Scanlan Avenue
Salina, KS 64701-8198

Attention: Mr. Marion Dome
Fax: 785/822-2508

17 November 1998

c: Brian Guynn – CURTIS PACKAGING - Fax: 816-356-7133
Jim Hendrix – CURTIS PACKAGING – Fax: 314-298-8235

---

## MACHINE MODELS BEING QUOTED

Doboy Two Leg Packaging System including: (Reference Floor Plan No. 451594)

- Doboy three to two lane converger.
- Two Doboy SK Microtronic Horizontal Wrappers.
- Two Doboy Four belt non-contact Servo Infeeds.
- Two SK300 Shrink Tunnels.

## PRODUCT SPECIFICATIONS

The proposed equipment will be designed to convey the following products:

| Description | Length | Height | Operating Speed |
|---|---|---|---|
| Pizza | 10-12" Diameter | 1.5 | Up to 80-rows / min |

NOTE: The system will be designed to run Pizza's from 6 to 15 inches in diameter.

SSE 001673

## PRODUCT SAMPLES

Product samples are critical to the success of your project. Ten (10) samples of each size product are required with your order for engineering evaluation and design work. An additional quantity of each product and wrapping material will be required at Doboy two weeks prior to the shipment of your equipment. Approximately ten (10) minutes worth of product (packages per minute x minutes) is the minimum quantity required for adequate testing and debugging at Doboy. Doboy is NOT responsible for delays in shipment due to a lack of product samples or wrapping materials.

## GUARDING

The guarding of the system is designed for maximum operator safety. Where beneficial, guarding will be hinged for accessibility. All interlocked guards will be incorporated into safety circuit which will automatically stop the associated equipment. The equipment will not operate with these guards open. All guarding not equipped for ready-operator accessibility will require tooling to remove.

## OPERATING INSTRUCTIONS

Included in the price of the system are two copies of our operation and parts manual. Included in this manual are sections on troubleshooting, maintenance procedures, electrical schematics, etc.

## ELECTRICAL SPECIFICATIONS

The system will be wired to accept 480 volt, 60 hertz, 3 phase with earth ground electrical service.

## THREE TO TWO LANE CONVERGER INCLUDES:

A. One 36-inch long poly cord diverging convey to increase spacing between columns.

B. One 36-inch long mat top acceleration and laning conveyor. Increases distance between pizza and places them on three known centers.

C One 30-inch long phasing conveyor Adjusting positions of outside lanes relative to center lane creating a space so the center lane can be swept to either side.

D. One 8-foot long mat top conveying converger with PHD air slide sweep mechanisms.

E. Two S-curve mat top product conveyors separate the two lanes for delivery to automatic wrapper infeeds.

F. Allen-Bradley SLC 504 programmable controller

**TOTAL PRICE OF CONVERGING UNIT AS SPECIFIED ABOVE:**
**F.O.B. Florence, KY .............................................................. $165,325.00**

**BASE WRAPPER INCLUDES:**

A. Heavy-duty frame to assure permanent bearing alignment during continual high-speed operation.

B. All electronic drive to assure a smooth, quiet, high-efficiency operation. Servo motors are sealed brushless type.

C. Infeed conveyor is included in feeder pricing.

D. 36-inch wide double parent roll backstand -- equipped with festoon rollers and integral parent roll brake assemblies.

E. Adjustable pin wheel perforator.

F. Package cutoff length adjustment via servo driven power feed roll and vacuum belt (eliminates need for mechanical variator) includes digital display of set cutoff length. Allows film to be run independent from rest of machine. Ideal for threading film.

G. Combination static/hot shoe lap sealer.

H. One-up sealing head assembly, 6-inch diameter with 17.5-inch wide knife.

I. No mechanical epicycle required, sealing head pause a function of the sealing head servo motor, automatically matches set cutoff length. Includes built in torque protection.

J. Two-way eye correction -- non-mechanical, self-compensating.

K. Solid state, proportioning type temperature controllers with digital readout. One controller provided for hot knife cut-off, and one controller for hot shoe lap seal. Plug-in type for easy removal.

L. Pivoting control panel for operator convenience. A touchscreen control panel is used to display various error messages, wrapper speed, mode of operation, cutoff length, and the output of several counters. Also has built-in diagnostics allowing quick isolation of component failures, vital information is pass code protected.

M. Allen-Bradley SLC 504 programmable controller – minimizes the need for relays, timers, etc. The PLC simplifies the control circuitry and can be expanded to accommodate future requirements.

N. Controlled acceleration and deceleration of wrapper during start and stop.

O. Machine stops with sealing head in open position during normal stop mode.

P. All normal product size change over adjustments are accomplished from the front of the machine.

Q. Standard voltage: 480-60-3 Electrical enclosures N.E.M.A. 4X, air conditioned.

R. Pre-programmed capability for up to ten product sizes.

S. Change parts for one size product (former and infeed chain).

T. Film hoist.

**TOTAL PRICE OF TWO UNITS AS SPECIFIED ABOVE:**
**F.O.B., Florence, KY .............................................................. $293,460.00**

**OTHER OPTIONS AVAILABLE:**

1. Additional formers.............................................................................$760.00

2. Additional infeed chains...................................................................$1,400.00

**BASE FEEDER INCLUDES:**

A. Three gap closing conveyors, each driven individually by a servo-motor, controlled by gap sensing eye.

B. Servo-driven product metering conveyor which synchronizes product to wrapper infeed flights.

C. Product transfer section to infeed lugs -- assist product transfer from metering belt to infeed conveyor.

D. No product eye -- stops wrapper when no product supply.

E. Speed control eye controls wrapper speed.

F. Cantilevered construction.

G. Stainless steel construction.

H. Polycord conveyor construction.

I. 18-inch wide conveyor.

J. Five-foot long stainless pizza style infeed conveyor.

**TOTAL PRICE OF TWO UNITS AS SPECIFIED ABOVE.**
**F.O.B. , Florence, KY ........................................................................ $203,275.00**

**BASE SHRINK TUNNEL INCLUDES:**

A. 90-inch long heating chamber.

B. 10-inch high by 18-inch wide opening.

C. 140-inch overall length.

D. Stainless steel construction

E. 480v -- 60 hz -- 3 ph electrics.

**TOTAL PRICE OF TWO UNITS AS SPECIFIED ABOVE.**
**F.O.B. Florence, KY ........................................................................ $104,250.00**

## SYSTEM PRICING

System price includes converging system, two SK Microtronic Wrappers, two Servo Infeeds and two SK-300 Tunnels as described above, plus five days of installation/start up supervision and five days of operator/maintenance training four weeks after installation.
F.O.B., Florence, Kentucky ..........................................................$756,610.00

## SHIP DATE

Doboy agrees to ship equipment from its New Richmond, WI facility on 28 May 1999 if an order for the system is placed before December 1, 1998. Delays in order entry or in receiving adequate product and materials for testing will result in an equivalent change in the ship date. SHIP NO LATER - MAY 14 MAY 15

## EFFICIENCY

Doboy guarantees a system efficiency as measured by the attached document to be 97%.

## PAYMENT TERMS

Thirty percent down payment with order, thirty percent due with after drawing approval, thirty percent before shipping. Ten percent 10% on final acceptance. A copy of Doboy's final acceptance and efficiency agreement is attached.

## SPARE PARTS

Doboy will furnish Schwan's a complete list of recommended spare parts along with a list of all purchased components with manufacturing part numbers prior to system shipment.

## FIELD SERVICE RATES

Effective 1 January 1997

Doboy factory-trained Service Technicians and Engineers are available to provide customers with standard repair and maintenance service, machinery modifications, installation, startup assistance, and technical training.

| | Monday - Friday | | | |
|---|---|---|---|---|
| Description | Regular Rate | Overtime Rate | Saturday Rate | Sunday & Holiday Rate |
| TRAVEL LABOR | | | | |
| Technician | $55.00/hr. | $82.50/hr. | $82.50/hr. | $110.00/hr. |
| Engineer | $55.00/hr. | $82.50/hr. | $82.50/hr. | $110.00/hr. |
| SERVICE LABOR | | | | |
| Technician | $85.00/hr. | $127.50/hr. | $127.50/hr. | $170.00/hr. |
| Engineer | $105.00/hr. | $157.50/hr. | $157.50/hr. | $210.00/hr. |

SSE 001678

Case 0:01-cv-00263-JNE-AJB Document 120 Filed 12/22/2005 Page 8 of 16



Note: Overtime applies after a continuous 8 hour period between 8:00 am and 5:00 p.m. (considered a standard work day), in a given 24 hour day and is/can be a combination of travel and service hours worked during the 8 hour period.

Note: *Travel time is the time required to get from Doboy's facility to the customers facility* and back.

The minimum charge for a Technician service call will be four hours or $340.00 plus all travel and living expenses.

The minimum charge for an Engineer service call will be four hours or $420.00 plus all travel and living expenses.

Normal travel expenses incurred by Doboy service personnel on the customer's behalf may include airport shuttle fee from Doboy New Richmond to the Minneapolis/St. Paul airport ($75.00 flat fee), train, airline, rental car, bus or taxi fare, tolls fees, and/or automobile at the rate of $.30 per mile.

Normal living expenses may include lodging, laundry, meals, telephone calls, rental car gas, etc.

Customer requested service personnel layovers (weekends) will have a flat rate charge of $375.00 per day plus living expenses.

Customer requested service personnel layovers (holidays) will have a flat rate charge of $680.00 per day plus living expenses.

**Note: When contacting Doboy's Field Service Department, please have your machine model name and machine serial number available for your customer service representative.**

**Customer's Responsibility for Installation Assistance:**

1) Report any visible damage to the received equipment to the freight carrier immediately at the time of equipment receipt before signing any receiving documents.

2) Uncrate and locate the equipment to its production location prior to startup.

3) Provide and secure all utility requirements to the equipment at its production location.

4) Provide mechanical and electrical assistance to Doboy's Service Technician.

**Customer's Responsibility for Installation and Service Assistance:**

I. Advise Doboy's Field Service Supervisor (FSS) at the time of request for service of any of the following:
   A. Safety requirements, i.e. shoes, clothing, hard hat, ear protection, eye protection, hair net, or prohibition of beards, rings, watches, etc.
   B. If production environment is wet or cold.
   C. If there are any security requirements.
   D. Please fax FSS a map from the airport to your plant.
   E. Plant hours of operation.

II. Please provide the following when requesting field service:
   A. PURCHASE ORDER NUMBER. Service will not be provided unless a purchase order number is provided prior to the technician's departure.
   B. Bill To and Ship To address where the work is to be performed.
   C. Name of primary and secondary contact person.
   D. Phone number of primary and secondary contact person.

III. Terms are net 30 days from date of invoice. A late fee of $50.00 per invoice and finance charges of .5 percent per month on the unpaid balance will be charged on invoices past 30 days. Failure to pay Doboy service, machine, or parts invoices by the due date may delay future service assistance until unpaid balances are paid in full.

## TERMS AND CONDITIONS OF SALE

### PRICES

Prices do not include sales or use taxes. Delinquent accounts shall bear interest at a rate of one and one-half percent (1-1/2%) per month on the unpaid balance.

### WARRANTY

The warranty described herein shall be IN LIEU OF any other warranty, expressed or implied, including but not limited to, any implied warranty of MERCHANTABILITY or fitness for a particular purpose.

A. GOODS NOT MANUFACTURED BY SELLER CARRY ONLY THE MANUFACTURER'S WARRANTY.

B. SELLER assumes no responsibility for the quality or performance of wrapper materials, bags, containers, labels, glues, or other materials purchased from others for use with SELLER'S goods.

C. The machinery manufactured by SELLER is warranted to be free from defects in material or workmanship for a period of one (1) year from the date the equipment is shipped. All parts proving defective during this period, based on SELLER'S examination, will be repaired or replaced free of charge within a reasonable time. Said warranty shall not apply if the equipment has not been operated and maintained in accordance with SELLER'S written instructions applicable to such equipment. Such warranty shall not apply if such equipment has been repaired, altered or modified by anyone other than SELLER or SELLER'S authorized representative. This warranty does not apply to wearable or disposable items such as heat elements, cutting knives, and sealing bands.

## LIMITATION OF LIABILITY

BUYER AGREES THAT IN NO EVENT SHALL SELLER HAVE LIABILITY FOR DIRECT DAMAGES IN EXCESS OF THE CONTRACT PRICE OF THE GOODS IN RESPECT OF WHICH CLAIM IS MADE, AND BUYER FURTHER AGREES THAT IN NO EVENT SHALL SELLER HAVE ANY LIABILITY FOR LOSS OF USE, LOSS OF PROFITS OR FOR ANY INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES OF ANY KIND.

## CANCELLATION

Buyer may cancel all or any of the goods by written notice to the SELLER prior to sixty (60) days before the acknowledged shipping date. On receipt of cancellation notice, all work on the goods canceled will be stopped as promptly as reasonably possible. Buyer agrees to pay to SELLER contract prices for complete goods and SELLER'S full costs (including burden and overhead) plus twenty percent (20%) for incomplete goods. SELLER reserves the right to complete and ship goods canceled less than sixty (60) days prior to the acknowledged shipping date.

## TITLE - RISK OF LOSS - INSURANCE - ASSIGNMENT

Delivery of the goods, F.O.B. SELLER'S plant, to a carrier or Buyer shall constitute transfer of risk of loss. Title to the goods shall remain with SELLER as a named loss payee until the full purchase price is paid. Neither Buyer nor SELLER shall assign this contract without the prior written consent of the other.

**MISCELLANEOUS**

This contract is the final, complete, and exclusive statement of the agreement between Buyer and SELLER. No terms, conditions, understandings, usage of the trade, courses of dealing, or agreements purporting to modify, vary, explain, or supplement this contract shall be binding unless and until hereinafter made in writing and signed by Buyer and SELLER. The validity, interpretation, and performance of this contract shall be governed by and construed in accordance with the laws of the State of Wisconsin.

| DOBOY DIVISION | SCHWAN'S SALES ENTERPRISES |
| --- | --- |
| By: [signature]<br>Terry Palmer<br>Account Manager – Wrappers | By:________________ |
| Date: 17 November 1998 | Date:________________ |

# DOBOY EQUIPMENT PERFORMANCE GUARANTEE

1. INTRODUCTION

1.1. DOBOY wrapping and related equipment is guaranteed to perform at a specific stated performance rating, expressed as a percentage; a 100% rating would represent a machine which will run at the agreed maximum speed continuously, with no stoppages or lost production.

1.2. This document interprets the DOBOY EQUIPMENT PERFORMANCE GUARANTEE, and sets out the procedure for the Customer and DOBOY to determine the actual performance rating after the equipment has been installed (generally known as the acceptance test).

1.3. The actual percentage rating for the performance guarantee for the equipment sold will be determined by DOBOY and stated in the Sales Proposal for that equipment. When the sales proposal is accepted by the Customer, this document for the performance guarantee becomes part of the Sales Contract.

2. GENERAL ACCEPTANCE TESTS

2.1. The purpose of the acceptance test is to demonstrate that the equipment does comply with the performance guarantee as specified, to bring finality to the installation phase, and to provide a vehicle to facilitate final payment by Customer.

2.2. Experience has shown that an acceptance test of two hours in length which is strictly controlled and monitored, yields more realistic results than the longer multiple shift tests which are expensive and difficult to monitor properly

2.3. DOBOY will provide personnel and supervision to perform an acceptance test, in conjunction with the Customer's personnel, of two hours in length under strictly controlled conditions, as described below. The acceptance test must be performed after installation and start-up is complete in the Customer's plant, under production conditions.

3. FINAL INSPECTION AND CHECKOUT AT DOBOY

3.1. The Customer's personnel must inspect the equipment for general compliance with contract specifications before shipment.

3.2. A relatively small amount of product will be run through the equipment. The wrapped product will be evaluated for compliance of the wrap to specifications, and the degree of product degradation, if any, incurred during the process. During the test, allowance will be made for the difference between product samples used for the field tests at DOBOY, and the product which is wrapped in the Customer's plant under production conditions.

3.3. During the inspection at DOBOY, DOBOY will demonstrate all features of the equipment, as far as practicalities allow.

3.4. DOBOY does not provide the logistics required to carry out any testing at it's Plant beyond that described in this paragraph.

4. ACCEPTANCE TEST – PROCEDURE (at Customer's Plant)

4.1. Doboy equipment specified for testing will be formally tested for a period of two hours. During the test, the equipment will be operated by the Customer's trained personnel (see paragraph 6) with the support of DOBOY personnel.

4.2. All raw product entering the system and wrapped product discharged will be counted and visually inspected. The use of electronic counting methods will be made when possible. All wrapped product will be evaluated for compliance with the specifications.

4.3. The following formula will be applied to assess the performance of the equipment:

$$E = \left[ \frac{\text{wrapped salable product}}{(\text{raw product}) - (\text{"m" factor})} \times 100 \right]$$

E = Efficiency expressed as a percentage

Wrapped salable product is defined as product that meets the Customer's quality standards (previously agreed to by DOBOY) for both package and contents, as stated in the Contract Documents.

SSE 001684

Raw product is defined as product that meets the contract size and quality specifications, and is properly presented to the Doboy equipment for wrapping.

The "m" factor is a modifier in the equation that adjusts for bad product and incidents that are out of the control of the Doboy equipment.

Where applicable, downtime caused by the DOBOY equipment will be recorded and measured against the total test duration.

4.4. During the test, personnel from the Customer and DOBOY will be assigned to monitor certain areas and to record incidents, bad product, equipment jams or the like, so that a fair assessment of the efficiency can be made after quantifying the results.

4.5. If the results of the test show the efficiency to be equal to or greater than the previously agreed performance rating, then the equipment will be in compliance with contract specifications and acceptable, and the following will occur:

4.5.1. The Customer will take final ownership of the equipment and sign documentation accordingly.

4.5.2. The Customer will make final payment.

4.6. If the results of the test show the efficiency to be less than the previously agreed performance rating, then the equipment will not be in compliance with contract specifications. In this case, the procedure set out in paragraph 5 will apply.

5. ACCEPTANCE TEST – RECTIFICATION

5.1 If the equipment fails the acceptance test as per paragraph 4.6 above Doboy will with in a specified time limited agreed upon by both parties (Doboy and Weatherly Consumer Products) bring the equipment up to standards and perform a successful acceptance test.

5.2. If an acceptable acceptance test is performed within a reasonable time period, then the contract will be completed as in paragraph 4.5.

5.3. If DOBOY is unable to rectify the equipment within a reasonable time period and perform a successful acceptance test, then modifications to the Contract Specifications will be negotiated per the terms and conditions set out in the main Contract Documents. Cancellation can occur only by mutual agreement of the Customer and DOBOY in terms of the main Contract Documents.

5.4. During any retesting of the equipment, all DOBOY personnel will be provided entirely at DOBOY expense, if the failure of the original test was caused by the DOBOY equipment.

6. TRAINING OF CUSTOMER PERSONNEL

6.1. The training of Customer operating and maintenance personnel is a vital component in the success of the acceptance test, and the continued success of the Customer in taking ownership and operating the equipment on an ongoing basis.

6.2. Consequently, notwithstanding anything to the contrary, DOBOY will not honor any Performance Guarantee or carry out any Acceptance Test if the Customer's personnel are not adequately trained to operate and maintain the equipment.

6.3. DOBOY can provide standard and customized training programs to suit the needs of any application. Customers are strongly advised to discuss their training needs with DOBOY at the time of contract negotiation, and to purchase DOBOY training packages which are given by qualified factory trained instructors.

6.4. If a Customer chooses to use the services of an outside consultant to provide training, then the results of that training and the competency the Customer's personnel must be demonstrated to DOBOY before any test can be conducted.

7. CONCLUSION

7.1. The above policy governing the DOBOY EQUIPMENT PERFORMANCE GUARANTEE has been designed and adopted by DOBOY to cover most applications. However, DOBOY recognizes that special applications may require that some parts of the policy be modified. If any modifications are agreed to by DOBOY, additional costs may be involved.

7.2. Any questions or concerns regarding the terms and conditions of this policy should be directed to your DOBOY Sales Executive.


451594
SSE 001687

# EXHIBIT B

**UNPUBLISHED DECISION**

**Netwig v. Georgia-Pacific Corp.,**

2002 WL 391354 (D. Minn. Mar. 11, 2002)

H

Only the Westlaw citation is currently available.

United States District Court, D. Minnesota.

Brian NETWIG, Plaintiff,
v.
GEORGIA-PACIFIC CORP. and Willamette Industries, Inc., Defendants.

**No. Civ.01-1253(DWF/AJB).**

March 11, 2002.

John P. Brendel, and Burke J. Ellingson, Brendel & Zinn, Saint Paul, Minnesota, and Patrick R. Miller, Ullman, Dezube & Miller, Overland Park, Kansas, on behalf of Plaintiff.

Lawrence J. Skoglund, and Thomas H. Schaefer, Erstad & Riemer, Minneapolis, Minnesota, on behalf of Defendant Georgia-Pacific Corp.

Lindsay G. Arthur, Jr., and Anton J. van der Merwe, Arthur, Chapman, Kettering, Smetak & Pikala, Minneapolis, Minnesota, on behalf of Defendant Willamette Industries, Inc.

MEMORANDUM OPINION AND ORDER

FRANK, J.

Introduction

***1** The above-entitled matter came on for hearing before the undersigned United States District Judge on March 1, 2002, pursuant to Defendants' Motions to Dismiss, or, in the alternative, to Transfer Venue. For the reasons set forth below, Defendants' motions are granted in part such that venue is transferred to the District of Kansas.

Background

Plaintiff Brian Netwig is a resident of Kansas. On January 21, 1999, Mr. Netwig sustained a serious eye injury while installing plumbing in a new home located in Johnson County, Kansas. When Mr. Netwig was injured, he was running copper plumbing between floor joists in the basement of the home. Plaintiff alleges that Defendant Georgia-Pacific Corporation ("Georgia-Pacific") and Defendant Willamette Industries, Inc. ("Willamette") were responsible for the manufacture and distribution of the floor joists.

Unfortunately, despite undergoing significant medical treatments, Mr. Netwig's injured eye was removed during the summer of 1999. Thereafter, Mr. Netwig pursued a worker's compensation claim. On January 17, 2001, Plaintiff filed a products liability complaint against the current Defendants in the United States District Court for the District of Kansas. Both Defendants filed motions to dismiss, asserting that the claim was barred by the Kansas commencement statute. Plaintiff voluntarily withdrew his claim, and subsequently filed the current action in the District of Minnesota on July 11, 2001. The current action mirrors the Kansas action with the additional counts for breach of warranties and fraudulent misrepresentation. On August 21, 2001, Plaintiff effected service on both Defendants. Georgia-Pacific was served through CT Corporation Systems, the Georgia-Pacific registered agent in Minnesota.

Georgia-Pacific is a Georgia corporation that does business in Minnesota, thus warranting the assignment of the aforementioned registered agent. Georgia- Pacific maintains that discovery will show that the I-beam at issue was routed through a Georgia-Pacific distribution facility somewhere near Kansas, but not in Minnesota. Willamette is an Oregon Corporation that has two paper production facilities and one building material distribution facility in Minnesota. The distribution facility, located in Potlatch, Minnesota, accounts for approximately 1.6% of the production of Willamette's I-joist inventory nationwide. Willamette maintains that the Potlatch I-joists are all sold through a wholesaler in Oregon.

Defendants filed the current motions to dismiss, arguing that Plaintiff purposefully withdrew his Kansas complaint to avoid a dispositive decision by the Kansas court and to take advantage of the more liberal Minnesota statute of limitations on products liability actions. Defendants argue that this Court should apply the Kansas statute of limitations or, in the alternative, the Court should transfer venue to the District of Kansas.

Discussion

1. Motions to Dismiss

In Kansas, the statute of limitations for products



EXHIBIT
tabbies
B

liability actions is 2 years. Kan. Stat. Ann. § 60-513. In order to comply with the statute, Plaintiff was required to file his action by January 21, 2001, two years from the date of his injury on January 21, 1999. Under the Kansas commencement statute, an action is commenced as of the date a complaint is filed, if a party is served within 90 days from the filing date. [FN1] Kan. Stat. Ann. § 60-203(a). As such, if Plaintiff had served Defendants within 90 days such that the Kansas action was commenced on the day the complaint was filed, then his action would have been within the statute of limitations.

FN1. Generally speaking, a federal action is commenced at the time the complaint is filed, pursuant to Rule 3 of the Federal Rules of Civil Procedure. Fed.R.Civ.P. 3. If a diversity action is brought in federal court and the claims arise under state law, however, then state commencement rules are applied for purposes of determining whether the statute of limitations has been met. *Walker v. Armco Steel Corp.*, 446 U.S. 740, 753 (1980).

***2** If service is effected *after* 90 days from when the complaint is filed, however, then the action is "commenced" upon the date of service. *Id.* If service cannot be effected within 90 days, a party may seek a thirty day extension from the court upon a showing of good cause. *Id.* Plaintiff did not seek such an extension from the Kansas court, and instead effected service 97 days after the complaint was filed, well within the time afforded by a 30-day extension, but past the 90-day requirement. As a result, Plaintiff's Kansas action was commenced on the day of service, April 24, 2001, and thus outside the 2-year statute of limitations. In light of these circumstances, Defendants filed their motions to dismiss. Plaintiff voluntarily withdrew his complaint, pursuant to Fed.R.Civ.P. 41. [FN2] Because Defendants had yet to file an answer in the Kansas action, Plaintiff was not required to seek consent of the Defendants nor the Court before voluntarily dismissing the case.

FN2. Rule 41 of the Federal Rules of Civil Procedure states in relevant part that: "Subject to the provisions of Rule 23(e), of Rule 66, and of any statute of the United States, an action may be dismissed by the plaintiff without order of court (i) by filing a notice of dismissal at any time before service by the adverse party of an answer...." Fed.R.Civ.P. 41(a)(1).

It is then that Plaintiff sought a forum in the District of Minnesota. In Minnesota, the statute of limitations for a products liability action is four years. Minn.Stat. § 541.05, subd. 2. By filing his action on July 11, 2001, and effecting service on August 24, 2001, Plaintiff is well within the 4-year statute of limitations which would expire on January 21, 2003. However, Defendants argue that Plaintiff should be prohibited from forum shopping and that if the Court were to engage in a choice of laws analysis, then the Court would find that Kansas law should apply and the suit would be barred. The Court would agree. As the Plaintiff has pointed out, however, if the choice of law to be applied is procedural rather than substantive, then the Court need not even reach the choice of laws analysis and should simply apply the procedural law of the forum state, *i.e.*, Minnesota law. *See Nesladek v. Ford Motor Co.*, 46 F.3d 734, 736 (8 th Cir.1995) (citations omitted).

Minnesota courts consider statutes of limitations to be procedural laws because they relate to remedy. *Id.* at 736-37. See also, *Fredin v. Sharp*, 176 F.R.D. 304, 307-09 (D.Minn.1997) (same with the exception of limitations periods that condition the right of action, such as a limitation period set forth within a wrongful death statute which also creates the statutory right of action). To the contrary, Kansas, Plaintiff's first choice of forum, views statutes of limitations as substantive law. *See, e.g., Waller v. Pittsburgh Corning Corp.*, 742 F.Supp. 581, 585 (D.Kan.1990). Nonetheless, this Court being located in the District of Minnesota must follow the lead of the Minnesota courts and regard statutes of limitations as laws of procedure. As such, the Court will not engage in a choice of laws analysis, and, applying the Minnesota statute, the Court finds Plaintiff's current action to be within the Minnesota statute of limitations.

Defendant Willamette argues that even if the Court determines the statute of limitations to be procedural and thus does not engage in a choice of laws analysis, the Court should still evaluate whether application of Minnesota law in this case would violate the principles of due process given the lack of contacts with the state of Minnesota. However, all of the cases that Defendant Willamette cites in support of this position are distinguishable on the basis that the relevant courts were determining whether to apply *substantive* law of a particular forum. *Home Ins. Co. v. Dick*, 281 U.S. 397 (1930); *John Hancock Mut. Life Ins. Co. v. Yates*, 299 U.S. 178 (1936); *Allstate Ins. Co. v. Hague*, 449 U.S. 302 (1981). To the extent

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

that the cases involved a question of whether a particular statute of limitations were to be applied, the limitations period was one created by contract or by a statute creating a right of action. As the Court indicated above, such limitations are considered by Minnesota courts to be substantive. The limitations period at issue here, however, is a straight statute of limitations that the Court finds would be considered procedural under Minnesota case law and thus applicable to the facts of this case.

***3** Accordingly, Defendants' motions to dismiss are denied to the extent that they argue for the application of the Kansas statute of limitations, and the Court will now address the issue of venue.

2. Alternative Motions to Transfer Venue

a. Standard of Review

Under 28 U.S.C. § 1404(a), "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." Generally, transfer under 1404(a) "should not be freely granted." *In re Nine Mile Ltd.*, 692 F.2d 56, 61 (8 th Cir.1982). The party seeking transfer bears the burden of proof to show that the balance of factors "strongly" favors the movant. *United Mortg. Corp. v. Plaza Mortg. Corp.*, 853 F.Supp. 311, 315 (D.Minn.1994). The purpose of § 1404 is "to prevent the waste of time, energy and money and to protect litigants, witnesses and the public against unnecessary inconvenience and expense." *Van Dusen v. Barrak,* 376 U.S. 612, 616 (1964) (citing *Continental Grain Co. v. Barge F.B.L.-585*, 364 U.S. 19, 26, 27 (1960)).

As a preliminary matter, the venue to which transfer is requested must be one in which the suit could have originally been sought. 28 U.S.C. § 1404(a); *Van Dusen*, 376 U.S. at 616 (1964). As § 1404(a) also provides, however, a court must consider: (1) the convenience of the parties; (2) the convenience of the witnesses; and (3) the interest of justice, when determining whether to grant a motion to transfer venue. *See Radisson Hotels Int'l, Inc. v. Westin Hotel Co.*, 931 F.Supp. 638, 641 (D.Minn.1996). In considering these factors, the court must look to the particular circumstances of the case before it. *Terra Int'l, Inc., v. Mississippi Chem. Corp.*, 119 F.3d 688, 691 (8 th Cir.1997), *cert. denied*, 522 U.S. 1029, 118 S.Ct. 629, 139 L.Ed. 609 (1997).

i. Proper Jurisdiction

The parties do not dispute that jurisdiction of this case is proper in the District of Kansas. Indeed, Plaintiff himself acknowledged this fact by first bringing a nearly identical action in the District of Kansas. Accordingly, the jurisdiction factor does not preclude transfer of venue as requested in this case.

ii. Convenience of the Parties

Courts recognize a presumption in favor of a plaintiff's choice of forum. *Christensen Hatch Farms, Inc. v. Peavey Co.*, 505 F.Supp. 903, 911 (D.Minn.1981). Section 1404(a) provides for transfer to a more convenient forum, "not to a forum likely to prove equally convenient or inconvenient, and a transfer should not be granted if the effect is simply to shift the inconvenience to the party resisting the transfer." *Graff v. Qwest Communications Corp .*, 33 F.Supp.2d 1117, 1121 (D.Minn.1999) (citing *Van Dusen*, 376 U.S. at 646 (1964)).

None of the parties are located here in Minnesota. To the extent that Defendants are represented in Minnesota by a registered agent or a satellite facility, to say that their presence in Minnesota is minimal with respect to the facts of this case is an understatement. While neither Defendant is located in Kansas as well, the Plaintiff is a resident of Kansas and acknowledged the obvious convenience of that forum by first filing his action there. The Court finds that the convenience of the parties is better served by litigating this claim in Kansas rather than Minnesota.

iii. Convenience of the Witnesses

***4** In considering the issue of convenience to witnesses, courts have focused on a number of factors including the number of non-party witnesses, the location of all witnesses, and the preference of courts for live testimony as opposed to depositions. *Graff*, 33 F.Supp.2d at 1121 (citing *Coast-to- Coast Stores Inc. v. Womack-Bowers, Inc.*, 594 F.Supp. 731, 732 (D.Minn.1984)).

Given that the accident giving rise to Plaintiff's claims occurred in Kansas, there is a strong likelihood that most or all of the witnesses will reside in Kansas. To the extent that witnesses will be from outside of Kansas, *e.g.*, corporate witnesses, there is no indication that these witnesses will be from Minnesota. Therefore, the Court finds that the convenience of the witnesses is also better served if the current litigation takes place in the District of Kansas.

iv. Interest of Justice

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

A number of considerations which may be relevant in considering this factor are courts' relative familiarity with the law to be applied, the relative ability of the parties to bear the expenses of litigating in a distant forum, judicial economy, the plaintiff's choice of forum, obstacles to a fair trial, and each party's ability to enforce a judgement. *Graff,* 33 F.Supp.2d at 1122.

There is no dispute that, given the location of Plaintiff's action, Kansas substantive law shall apply. While a Minnesota court is certainly capable of fairly and aptly applying the law of another jurisdiction, a Kansas court is undoubtedly more familiar with the relevant law and its proper application. More importantly, however, there is no indication that Minnesota has any interest to protect or serve by maintaining this case in one of its courts. To the contrary, Kansas has an obvious interest in protecting the rights of its citizenry and resolving local controversies in its own courts. Indeed, the United States Supreme Court recognizes that a jury of one forum should not be burdened with a controversy of another forum when the jurors have no interest in the controversy at hand. *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508 (1947). In conclusion, the Court finds that the interests of justice are better served if this action is transferred to the District of Kansas.

Plaintiff maintains that if this action is transferred to the District of Kansas, then the court in Kansas will be obligated to apply the substantive law of Minnesota. *See Van Dusen v. Barrack,* 376 U.S. 612 (1964) (holding that transferee court must apply choice-of-law rules of transferor when a case is transferred by defendant under § 1404(a)). This Court declines to make any further determination in this case, finding that a court within the District of Kansas is better positioned to determine how this case shall proceed once the transfer has occurred. While the Court sees this case as a flagrant example of forum shopping upon an unexplained failure to comply with Kansas commencement law, this Court can make no other determination upon the motions before it other than to find it appropriate to transfer venue to the District of Kansas. This result likely comes as no surprise to any of the parties, particularly Plaintiff, given his original choice of Kansas as his preferred forum. It is beyond the Court, however, why a case obviously belonging in the District of Kansas should have taken the circuitous route through Minnesota to get there. Accordingly, Defendants' motions are granted in part such that venue shall be transferred to the District of Kansas.

***5** For the reasons stated, IT IS HEREBY ORDERED THAT:

1. Defendant Georgia-Pacific's Motion to Dismiss or, in the alternative, to Change Venue (Doc. No. 16) is GRANTED IN PART;

2. Defendant Willamette's Motion to Dismiss or, alternatively, to Transfer Venue (Doc. No. 20) is GRANTED IN PART; and

3. Venue shall be transferred out of the District of Minnesota to the District of Kansas.

2002 WL 391354 (D.Minn.)

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works