# EXHIBIT C

**UNPUBLISHED DECISION**

**<u>Lakehead Electric Company v. Lakehead Pipe Line Company, Inc.</u>,**

1993 WL 515821 (Minn. App. Dec. 14, 1993)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d
Not Reported in N.W.2d, 1993 WL 515821 (Minn.App.)
**(Cite as: 1993 WL 515821 (Minn.App.))**

Only the Westlaw citation is currently available.

NOTICE: THIS OPINION IS DESIGNATED AS UNPUBLISHED AND MAY NOT BE CITED EXCEPT AS PROVIDED BY MINN. ST. SEC. 480A.08(3).

Court of Appeals of Minnesota.
**LAKEHEAD ELECTRIC COMPANY, Respondent,**
**v.**
**LAKEHEAD PIPE LINE COMPANY, INC., Appellant.**
**No. C0-93-1150.**

Dec. 14, 1993.

Appeal from District Court, Ramsey County; Kathleen Gearin, Judge.

Robert H. Magie, III, Duluth, for appellant.

Timothy C. Cook, St. Paul, for respondent.

Considered and decided by CRIPPEN, P.J., and HUSPENI and SHORT, JJ.

UNPUBLISHED OPINION

HUSPENI, Judge.

***1** Lakehead Pipe Line Co. challenges the amount of damages and preverdict interest awarded in a breach of contract action. Lakehead Electric Co. submits for review the issues of whether the trial court correctly determined overtime damages and whether it was entitled to interest on contract amounts that Lakehead Pipe Line Co. retained beyond completion of work. Because we do not find the special verdict answers palpably contrary to the evidence, we affirm.

FACTS

This lawsuit concerns site improvements made by respondent Lakehead Electric Co. as part of a contract with appellant Lakehead Pipe Line Co. to build a switch gear station near Ino, Wisconsin. The parties' contract specified how respondent was to perform the site improvements, and what materials it should use. The contract also permitted payment for extra work and expenses incurred on the job as approved by appellant.

Respondent contends that the contract afforded it the right to determine the method and manner of its performance and scheduling, but that appellant, through its project inspector Ross Compton, asserted complete control over the project and dictated the method and time of performance as well as the means. As a result of Compton's conduct, respondent incurred extra costs for materials, overtime, and a subcontractor it hired to assist in completing the site improvements. Neither party appears to have kept detailed records of the daily expenditures for time and materials or for extra work. Respondent claims that it became difficult to keep track of appellant's extra requirements because Compton's orders changed frequently. Appellant argued at trial that respondent merely calculated the total costs of performing the site improvements without designating which costs were attributable to appellant's conduct.

Respondent completed work on the entire project on January 9, 1991. In order to receive amounts appellant retained under the contract, respondent was to submit to appellant a final sworn statement warranting that no one had a right to file or enforce a lien on account of having furnished services or materials for the project. Respondent filed the affidavit on October 16, 1992, and appellant paid respondent amounts it retained on the project on the same day. In a posttrial motion, respondent requested that the court award it interest on the retainage, which could have been due as early as July 9, 1991. The court denied the request.

DECISION

On review, answers to special verdict questions will not be set aside unless they are perverse and palpably contrary to the evidence or where the evidence is so clear to leave no room for differences among reasonable people. The evidence must be reviewed in the light most favorable to the jury verdict.

*Karnes v. Milo Beauty & Barber Supply Co.*, 441 N.W.2d 565, 567 (Minn.App.1989) (citation omitted), *pet. for rev. denied* (Minn. Aug. 15,

EXHIBIT C

1989). The same standard of review applies to damage awards. *See Levienn v. Metropolitan Transit Comm'n,* 297 N.W.2d 272, 273 (Minn.1980); *Rayford v. Metropolitan Transit Comm'n,* 379 N.W.2d 161, 165 (Minn.App.1985), *pet. for rev. denied* (Minn. Feb. 14, 1986).

*2 1. Pursuant to the parties' contract, we apply Wisconsin law to the issue of damages. Wisconsin law rejects the total cost method of calculating damages, which is the amount spent less the bid amount. Instead, Wisconsin favors the "reasonable cost" method, which is the difference between what it reasonably cost to do the work under the conditions actually encountered and the cost if those conditions had not been encountered. *Metropolitan Sewerage Comm'n v. R.W. Constr. Inc.,* 255 N.W.2d 293, 298 (Wis.1977). Wisconsin courts also accept "jury type" verdicts where the record is inadequate to assess specific damages, yet there is liability. *Id.* at 299. In "jury type" verdicts the evidence must be sufficient to enable the court or jury to make a reasonable approximation of the damages. *Id.*

Appellant argues that respondent used the "total cost" method in calculating its damages and did not produce sufficient evidence of the extra work attributable to appellant's breach to permit a reasonable calculation of the damages. Respondent argues that its award was a "jury type" verdict and therefore is acceptable. We agree with respondent.

Respondent's proof of damages consists of its letter to appellant detailing its problems with appellant's conduct during the project and the extra costs it incurred because of that conduct, as well as testimony describing how those damages were calculated. Appellant had ample opportunity to present evidence contradicting respondent's measure of damages. After all the evidence was received, the jury declined to award respondent all of the damages it claimed. In particular, the amount respondent claimed for the site improvement work was $23,722.86 more than the jury award.

Compliance with the rule of reasonable certainty does not make it necessary to prove damages with mathematical certainty. *Plywood Oshkosh v. Van's Realty & Constr. of Appleton,* 257 N.W.2d 847, 849 (Wis.1977). In estimating damages

> all that the litigants have any right to expect is the exercise of the court's best judgment upon the basis of the evidence provided by the parties.

*R.W. Constr. Co.,* 255 N.W.2d at 299 (quoting *Specialty Assembling & Packing Co. v. United States,* 355 F.2d 554, 572 (Ct.Cl.1966)). Viewing the evidence in the light most favorable to the verdict, we find that the jury in this case exercised its best judgment based on the documents and testimony before it, and do not find its conclusions palpably contrary to the evidence.

2. Appellant claims that respondent is not entitled to preverdict interest because it did not make a demand for settlement, which appellant argues is a requirement under Minn.Stat. § 549.09, subd. 1(b). Because prejudgment interest is a procedural issue that is governed by the law of the forum, we apply Minnesota law to this issue. *Zaretsky v. Molecular Biosystems, Inc.,* 464 N.W.2d 546, 551 (Minn.App.1990).

Appellant contends that because respondent made no settlement offer, it should not be entitled to benefit from the statute because to do so would be contrary to the statute's intent to promote settlement. We disagree. The language of the statute provides for a written offer of settlement, but does not require one. [FN1] A written settlement offer is one action that triggers the calculation of prejudgment interest, but it is only one way to do so. A party also can calculate prejudgment interest from the date the action commenced or arbitration was demanded. Commentators agree that a proper reading of the statute is that prejudgment interest will be allowed whenever appropriate, whether or not a party has made a settlement offer. 3 Douglas D. McFarland & William J. Keppel, *Minnesota Civil Practice* § 2508, at 596-97 (2d ed. 1990). We therefore find that the award of prejudgment interest in this case comports with Minnesota law.

Not our situation

> FN1. Except as otherwise provided by contract or allowed by law, preverdict or prereport interest on pecuniary damages shall be computed as provided in clause (c) from the time of the commencement of the action, or the time of a written settlement demand, whichever occurs first * * *. If either party serves a written offer of settlement, the other party may serve a written acceptance or a written counteroffer within 60 days. After that time interest on the judgment shall be calculated by the judge in the following manner.
> Minn.Stat. § 549.09, subd. 1(b) (1992).

*3 3. Respondent argues that the trial court erred in deciding upon posttrial motion to reduce by half the

amount of damages awarded for overtime. We will set aside the court's decision only if it is "manifestly and palpably contrary to the evidence." *Levienn,* 297 N.W.2d at 273.

The evidence in this case revealed that respondent made several errors in computing overtime and that it voluntarily reduced by half the amount originally claimed. There were several discrepancies between respondent's and appellant's views of how the overtime damages should be calculated, and respondent admitted that some of the overtime was owing to its own inefficiencies. Viewing the evidence in the light most favorable to the verdict, we do not find the reduction on posttrial motion to be manifestly contrary to the evidence.

4. Respondent also argues that because appellant delayed fifteen months in remitting amounts it had retained on the contract, respondent is entitled to interest on the retainage. The contract between the parties, however, required respondent to submit a final statement averring the absence of any liens or claims once the period for filing liens and claims expired, in order to receive the amounts retained. Respondent could have filed this affidavit as early as July 9, 1991, but did not do so until October 16, 1992.

We reject respondent's argument that it did not file the affidavit earlier because it believed that doing so would prevent it from pursuing this action. Respondent could have excepted this lawsuit from the terms of the affidavit and filed it as soon as the claim period expired. If appellant rejected the exception, respondent would have a reason for the delay and then might be entitled to interest on the amount retained. Because respondent did not act, however, we cannot penalize appellant.

Affirmed.

Not Reported in N.W.2d, 1993 WL 515821 (Minn.App.)

END OF DOCUMENT

# EXHIBIT D

**UNPUBLISHED DECISION**

**Ferris, Baker Watts, Inc. v. Deutsche Bank Securities Ltd.**, 2004 WL 2501563 (D. Minn. Nov. 5, 2004)

Westlaw.



H
Briefs and Other Related Documents

United States District Court,D. Minnesota.
FERRIS, BAKER WATTS, INC. (Civ. No. 02-3682) and James P. Stephenson, in his capacity as trustee for the estate of MJK Clearing, Inc. (Civ. No. 02-4845), Plaintiffs,
v.
**DEUTSCHE BANK SECURITIES** LTD, et al. and Deutsche Bank AG, et al., Defendants.
**Nos. 02-3682, 02-4845.**

Nov. 5, 2004.

Robert L. Schnell, Jr., James L. Volling, Stephen M. Mertz, Jason K. Walbourn, Jesseca R.F. Grassley, Theodore R. Cheesebrough, Martin S. Chester, Faegre & Benson LLP, Minneapolis, MN, for Plaintiff James P. Stephenson, in his capacity as trustee for the estate of MJK Clearing, Inc.
Thomas E. Jamison, K. Jon Breyer, Fruth, Jamison & Elsass, P.A., Minneapolis, MN, Richard A. Kirby, John Longstreth, Todd Reuter, Jessie K. Miner, Preston Gates Ellis & Rouvelas Meeds, LLP, Washington, DC, for Plaintiff Ferris, Baker Watts, Inc.
Michael E. Keyes, David E. Runck, Oppenheimer, Wolff & Donnelly LLP, Minneapolis, MN, James H.R. Windels, Christine Murtha, Michael Russano, Catheryn A. O'Rourke, Laura Laux Higgins, Davis Polk & Wardwell, New York, NY, for Defendants **Deutsche Bank Securities** Limited, **Deutsche Bank Securities**, Inc., and Deutsche Bank AG.
Teresa J. Kimker, Halleland Lewis Nilan Sipkins & Johnson, P.A., Minneapolis, MN, Richard M. Strassberg, Jeffrey A. Simes, Goodwin Procter LLP, New York, NY, for Defendant Wayne Breedon.
Madge S. Thorsen, Daniel Bryden, Kelly & Berens, P.A., Minneapolis, MN, Michael J. Dell, Jonathan M. Wagner, Kramer Levin Naftalis & Frankel LLP, New York, NY, Daniel A. Ross, Michele Pahmer, Stroock & Stroock & Lavan LLP, New York, NY, Marc Dreier, Amianna Stovall, Dreier LLP, New York, NY, for Defendants Nomura Canada, Inc., Nomura Securities International, Inc., and Scott Reed.
J. Patrick McDavitt, Julie H. Firestone, Briggs & Morgan, P.A., Minneapolis, MN, Joel S. Forman, Daniel R. Marcus, Curtis, Mallet-Prevost, Colt & Mosle, New York, NY, for Defendant James Smith.
Michael S. Ryan, Murnane, Conlin, White & Brandt, St. Paul, MN, Dominic F. Amorosa, New York, NY, Michael Q. Carey, Carey & Associates LLC, New York, NY, for Defendant Richard Evangelista.

MEMORANDUM OPINION AND ORDER

KYLE, J.

Introduction FN1

FN1. The appearances for the parties are attached to this Order as Appendix A.

*1 These matters come before the Court on Defendants' Partial Motions to Dismiss Plaintiffs' Complaints. Defendants argue that Plaintiffs' New Jersey state law RICO claims must be dismissed in favor of the application of Minnesota law. After consideration of Minnesota's choice of law rules, the Court determines that the application of New Jersey's law to the relevant claims is proper. Thus, Defendants' Partial Motions to Dismiss will be denied.

Background FN2

FN2. The Court will accept as true the allegations in FBW's Second Amended Complaint and the Trustee's Second Amended Corrected Complaint.

In two related actions, Plaintiffs James P. Stephenson, in his capacity as trustee for the estate of MJK Clearing, Inc. ("the Trustee"), and Ferris, Baker Watts, Inc. ("FBW"), FN3 have separately sued Defendants Deutsche Bank AG, **Deutsche Bank Securities**, Inc., **Deutsche Bank Securities** Limited,

© 2005 Thomson/West. N Works.

EXHIBIT
D
tabbies

Wayne Breedon, RBF International, Inc., Kenneth D'Angelo, Richard Evangelista, Ultimate Holdings, Ltd., Ramy El-Batrawi, Adnan Khashoggi, and other parties that are not common to the two suits. FN4 The original Complaints in these actions were filed in September 2002, and alleged, *inter alia,* violations of federal and state securities laws.

FN3. When referring to the Trustee and FBW collectively, the Court will use the term "Plaintiffs."

FN4. The Trustee also sued GenesisIntermedia, Inc., Bradford Keiller, and John Does 1-10; FBW also sued Nomura Canada, Inc., Nomura Securities International, Inc. Scott Reed, James Smith, and A .G. Edwards and Sons, Inc.

Both FBW and the Trustee recently amended their Complaints to add claims under the New Jersey Racketeer and Corrupt Organizations Act ("the New Jersey RICO Act"), N.J.S.A. 2C:41-2, *et seq..* FN5 (FBW Second Am. Compl. Count XXIII; Trustee Second Am. Corrected Compl. Counts XII-XIV.) Some of the defendants against whom the New Jersey RICO claims are asserted have moved to dismiss these claims under Minnesota choice of law principles. FN6

FN5. Plaintiffs brought federal RICO claims in their original complaints. This Court dismissed those claims upon motion by some of the defendants, determining that the Private Securities Litigation Reform Act ("PSLRA") barred the federal RICO claims. *Stephenson v. Deutsche Bank AG,* 282 F.Supp.2d 1032, 1071 (D. Minn 2003).

FN6. The moving defendants are Deutsche Bank AG, **Deutsche Bank Securities,** Deutsche Bank SL, Breedon, Smith, Evangelista, Nomura Canada, Inc., Nomura Securities International, Inc., and Reed. The moving defendants collectively will be referred to as "Defendants."

This Court has previously set forth in great detail the facts underlying these cases. *Stephenson v. Deutsche Bank AG,* 282 F.Supp.2d 1032, 1044-51 (D.Minn.2003). A complete re-statement of the underlying facts is unnecessary for the purposes of the motions now before the Court. Briefly, Plaintiffs allege an orchestrated scheme involving a common practice in the securities industry known as securities lending and borrowing. (FBW Second Am. Compl. 4.) In simplified terms, Plaintiffs contend that Defendants conducted fraudulent transactions, in part by "lending and re-lending [shares of thinly traded stocks] through as many as ten different intermediary ... broker-dealers," thereby "concealing the source of the stock loans" and limiting Defendants' loan risk. (*Id.* 8.) These transactions led to the ruin of MJK Clearing, Inc. ("MJK") and are the subject of Plaintiffs' newly added New Jersey RICO claims. The only issues raised by the instant motions pertain to choice of law-thus, the relevant facts, as set forth below, involve the relationship of the parties and transactions to New Jersey and Minnesota.

Plaintiffs' contacts are centered in Minnesota and Washington, D.C. MJK is a Minnesota corporation with its principal place of business in Minnesota. FBW is a Delaware corporation with its principal place of business in Washington, D.C. Business transactions between MJK and FBW, which form the basis of FBW's claims against Defendants, constitute FBW's connection to Minnesota. Both parties are connected to New Jersey solely through the transactions underlying the lawsuits.

***2** Defendants have numerous New Jersey contacts. Defendant Kenneth D'Angelo is a New Jersey resident and at all relevant times was in control of defendant RBF International, Inc. ("RBF"), a New Jersey corporation. (FBW Second Am. Com pl. ¶ 26-27.) Native Nations is a New Jersey corporation and would be a defendant in these actions but for the fact that it is currently subject to involuntary bankruptcy proceedings in the United States Bankruptcy Court for the District of New Jersey. (*Id.* ¶ 35.) Defendant Richard Evangelista is a New Jersey resident and was an employee of, and agent for, Native Nations. (*Id.* ¶ 29.) Defendant James Smith is a citizen of New York, and at all relevant times was the president of, and an agent for, Native Nations. (*Id.* ¶ 28.)

The transactions underlying this case were "arranged by defendants D'Angelo and RBF working together with defendant [Wayne] Breedon at Deutsche Bank Canada and defendant Evangelista at Native Nations." (*Id.* 65.) Native Nations is described as "the principal broker-dealer involved in the stock loan scheme." (*Id.* 26.) The company "was used to evade the regulatory controls on the stock-lending activities and thereby funnel the securities into the stock loan network." (*Id.* 11.)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

According to the Trustee's Complaint, "Defendants Deutsche Bank and its affiliated entities and persons; RBF and its president, Kenneth D'Angelo; and Richard Evangelista of Native Nations concocted a series of fraudulent transactions...." (Trustee Second Am. Corrected Compl. 48.) For example, MJK first became involved in the transactions (that would eventually lead to the company's demise) when Evangelista called the company and convinced MJK to participate in a transaction; that transaction was "structured and arranged by Mr. Breedon and Mr. D'Angelo." (*Id.* 70.) FBW became involved when "D'Angelo and Breedon caused MJK-which they effectively controlled at this point-to induce FBW to enter into a [fraudulent] stock loan transaction." (FBW Second Am. Compl. 13 .) Telephone conversations that were automatically recorded by Deutsche Bank Canada further implicate D'Angelo as a key player in the allegedly illegal activity. The Trustee quotes numerous telephone conversations in his Complaint, the vast majority of which consist of Breedon and D'Angelo discussing the various transactions and schemes they arranged and controlled. (*See, e.g.,* Trustee Second Am. Corrected Compl. ¶¶ 53, 55, 57, 59, 91, 94.)

Standard of Decision

"Dismissal under Rule 12(b)(6) serves to eliminate actions which are fatally flawed in their legal premises and destined to fail, thereby sparing litigants the burden of unnecessary pretrial and trial activity." *Young v. City of St. Charles, Mo.,* 244 F.3d 623, 627 (8th Cir.2001). A cause of action "should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff cannot prove any set of facts in support of his claim that would entitle him to relief." *Schaller Tel. Co. v. Golden Sky Sys., Inc.,* 298 F.3d 736, 740 (8th Cir.2002) (internal citations omitted) (citing *Kohl v. Casson,* 5 F.3d 1141, 1148 (8th Cir.1993)). In analyzing the adequacy of a complaint's allegations under Rule 12(b)(6), the Court must construe the complaint liberally and afford the plaintiff all reasonable inferences to be drawn from those allegations. *See Turner v. Holbrook,* 278 F.3d 754, 757 (8th Cir.2002).

Analysis

***3** These motions present the Court with a narrow issue in the context of a massive and complex dispute involving more than twenty parties and numerous related lawsuits. The Court is asked to dismiss Plaintiffs' newly added New Jersey RICO claims under Minnesota's choice of law rules. While the issue presented to the Court is limited, the context in which this choice of law question arises makes the application of seemingly straightforward principles more complicated. Specifically, the number of parties and the varying nature of their contacts with Minnesota, New Jersey and other states creates an obstacle to an otherwise straightforward application of the law. Such facts raise some of the same choice of law difficulties as those that occur in "mass tort" cases. *See Simon v. Philip Morris Inc.,* 124 F.Supp.2d 46, 60 (E.D.N.Y.2000) ("The most difficult choice of law problems occur when mass torts plaintiffs from many jurisdictions sue a number of defendants, all of whom have different contacts with the forum state."). That the Plaintiffs' injuries and the Defendants' racketeering activities did not occur in the same states adds further complexity. *See id.* at 57 (stating that "multi-state transactions are more complex when the defendant's tortious conduct and the plaintiff's injury occur in different states").

Minnesota's approach to choice of law questions involves the analysis of four independent considerations. The Court must determine whether: first-there is an actual conflict between the Minnesota and New Jersey laws at issue; second-the laws at issue are procedural or substantive; and third-regardless of which state's law is applied to the claims, the underlying facts present sufficient contacts with that state to satisfy constitutional requirements. Finally, if the Court determines that there is an actual conflict, the laws at issue are substantive, and the application of the laws is consistent with constitutional standards, then the Court must determine which state's law should apply based on Minnesota's five-factor choice of law analysis. Under these principles, and with the complexity of the litigation in mind, the Court concludes that application of New Jersey law to Plaintiffs' state law RICO claims is appropriate.

I. Conflict of Law

The Court need not embark on a choice of law analysis if the Minnesota and New Jersey RICO Acts do not actually conflict. *See, e.g., Nesladek v. Ford Motor Co.,* 46 F.3d 734, 736 (8th Cir.1995). "Federal courts sitting in diversity apply the forum state's conflict of laws rules." *Id.,* 46 F.3d at 736 (citation omitted). In Minnesota, "[a] conflict of law exists if choosing the law of one state over the law of another state would be outcome determinative." *Schumacher*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*v. Schumacher,* 676 N.W.2d 685, 689 (Minn.Ct.App.2004) (internal quotation omitted).

Defendants contend that there is an actual conflict between Minnesota's RICO Act and New Jersey's RICO Act. The application of Minnesota law to Plaintiffs' RICO claims would effectively dispose of those claims because Minnesota's RICO Act does not recognize a private cause of action. Minn.Stat. § 609.902, subd. 9, 609.911, subd. 1 ("The prosecuting authority may institute civil proceedings in district court" for violation of the RICO Act; " 'Prosecuting authority' means the office of a county attorney or office of the attorney general."). Conversely, the application of New Jersey's law would allow Plaintiffs to proceed with their RICO claims because that State's Act creates a private cause of action and recognizes securities fraud as a predicate act. N.J.S.A. 2C:41-4(c) (granting private right of action to "[a]ny person damaged in his business or property by reason of violation" of the RICO Act); N.J.S.A. 2C:41-1(a)(1)(p) (" 'Racketeering activity' means ... fraud in the offering, sale or purchase or securities."). Because the viability of Plaintiffs' RICO claims depends on which state's law applies, the application of either New Jersey or Minnesota law in these matters would be outcome determinative. FN7 *See, e.g., Nesladek,* 46 F.3d at 736 (holding that conflict of law existed when "Minnesota's ... statute would not necessarily be dispositive of [plaintiff's] claim" but would allow the claim to go to the jury, whereas under Nebraska law the plaintiff could not maintain an action at all). Accordingly, there is an actual conflict of laws here.

FN7. The Trustee and Defendants agree that the application of either state's law is outcome determinative. FBW, however, argues that there is no actual conflict between the New Jersey and Minnesota RICO Acts because the Minnesota Act does not apply to securities fraud. Thus, according to FBW, Minnesota has not legislated in this area of the law. (*See* FBW Mem. in Opp'n at 11.) FBW does not support its position with any authority, nor does it dispute that the difference between the two Acts would be outcome determinative. *See Schumacher,* 676 N.W.2d at 689-90 (holding conflict of law existed where "[t]he parties agree that, under Iowa law, respondent would not be liable ... because [an] immunity statute applies to the facts of this case," and Minnesota had no similar immunity statute).

II. Substantive or Procedural

*4 Having concluded that the Minnesota and New Jersey RICO Acts conflict, "the [next] step is to decide whether the question is substantive or procedural." *Danielson v. Nat'l Supply Co.,* 670 N.W.2d 1, 5 (Minn.Ct.App.2003). Defendants argue that the RICO Acts are procedural or remedial. If a law is procedural, the law of the forum state applies, and no further choice of law analysis is needed. *Id.* "[S]ubstantive law is that part of law which creates, defines, and regulates rights, as opposed to adjective or remedial law, which prescribes method[s] of enforcing the rights or obtaining redress for their invasion." *Nesladek,* 46 F.3d at 736 (internal quotation omitted). The purpose of the statute is significant in this analysis; a statute may be deemed procedural if "[i]ts application is unrelated to the merits of the case." *Zaretsky v. Molecular Biosystems, Inc.,* 464 N.W.2d 546, 550 (Minn.Ct.App.1990). FN8

FN8. In *Zaretsky,* the Minnesota Court of Appeals determined that a pre-judgment interest statute was procedural. 464 N.W.2d at 550. The court did so despite being "reluctant to classify anything as procedural because of the potential that doing so will encourage forum shopping." *Id.* at 550 n. 2. The statute's purpose was to encourage settlements, and while it provided compensation for loss, it simply "affect[ed] the relationship between the parties as litigants, not ... their relationship on the underlying matter in dispute." *Id.* at 550. The RICO Acts are distinguishable; the purpose of the RICO Acts is to prevent and eradicate racketeering activities, and the RICO laws are directly related to the merits of the underlying dispute.

Under this framework, the Court determines that the RICO Acts are substantive. While Defendants acknowledge that the procedure versus substance analysis should focus on the purpose of the statute (Deutsche Bank Reply Mem. at 9; Nomura Mem. in Supp. at 8-9.), they overlook the substantive aspects of Minnesota's RICO Act. According to Defendants, the purpose of the state RICO Acts "is not to create, define, or regulate new substantive offenses, but rather to offer a new method of obtaining redress for existing offenses." (Deutsche Bank Reply Mem. at

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

9.) The Minnesota Supreme Court, however, has rejected such an interpretation of the Minnesota RICO Act. The court held that under the Minnesota RICO Act the State must prove, in addition to the predicate acts, "a 'pattern of criminal activity,' and this pattern involves more than just the predicate criminal acts." *State v. Huynh,* 519 N.W.2d 191, 195 (Minn.1994) (considering Minn.Stat. 609.903, subd. 1(1)). Such an additional showing is required under the Act because otherwise "the RICO offense collapses into nothing more than the enhanced punishment of recidivists." *Id.* It is apparent from *Huynh* that Minnesota courts view Minnesota's RICO Act as substantive and as related to the underlying merits of the case. *Zaretsky,* 464 N .W.2d at 550.

The New Jersey RICO Act is also substantive as it clearly creates, defines, and regulates rights. *See Nesladek,* 46 F.3d at 737-38. The Act "directly impacts on the accrual of a cause of action in the first instance," as the statute at issue in *Nesladek* did. *Id.* The Court is unaware of any convincing authority indicating otherwise. Defendants cite *United States v. Neapolitan,* 791 F.2d 489 (7th Cir.1986), as support for the contention that RICO is a procedural statute. (Deutsche Bank Mems. in Supp. at 8.) *Neapolitan,* however, was addressing the federal RICO Act, which is not dispositive with regard to the Minnesota or New Jersey Acts. Moreover, because the court was considering the federal RICO Act, choice of law was not at issue in that case. *Id.* at 494-95; *see also Jepson v. Gen. Cas. Co. of Wis.,* 513 N.W.2d 467, 472 (Minn.1994) (distinguishing case as having "no bearing on the choice of law issue confronting [the court]" in part because it "was not a choice of law case"). It is also significant that, unlike the cases now before the court, *Neapolitan* was a criminal case. [FN9] 791 F.2d at 4995.

FN9. Defendants' reliance on criminal cases is further undermined by the Supreme Court of New Jersey's decision in *State v. Ball,* 661 A.2d 251 (N.J.1995). While citing *Neapolitan* approvingly in defining the parameters of a criminal conspiracy conviction under the New Jersey RICO Act, the *Ball* court drew a clear distinction between a "RICO conspiracy" and a "substantive RICO offense." *Id.* at 268-70. In fact, the court referred to a subsection of the statute at issue in this case as "the substantive participation provision of the statute." *Id.* at 268. Thus, even under Defendants' own authority, the New Jersey RICO Act must be recognized as a substantive statute.

Defendants also contend that, in passing the PSLRA, which bars federal RICO claims based on securities fraud, Congress was responding to a concern that RICO "not replace or supplement existing substantive securities law." (Deutsche Bank Mems. in Supp. at 8-9.) This has no bearing, however, on Minnesota's or New Jersey's RICO Acts, or on a state's interest in maintaining a private action for securities fraud under its RICO Act. This is especially true regarding New Jersey's RICO Act because it is "even broader in scope than its federal counterpart." *Maxim Sewerage Corp. v. Monmouth Ridings,* 640 A.2d 1216, 1220 (N.J.Super.1993) (internal quotation omitted).

Although not cited by the parties, the Eighth Circuit's opinion in *Popp Telecom, Inc. v. Am. Sharecom,* 361 F.3d 482, 489 (8th Cir.2004), that the PSLRA "is merely a procedural rule regulating the filing of a RICO claim," is inapposite to the instant case. First, the court was only addressing the PSLRA-not RICO Acts generally or the federal RICO Act in its entirety. Second, the court was not dealing with a conflict of law issue. While the Court suggests that the right to obtain treble damages under the federal RICO Act does not create a substantive cause of action, *id.* at 489, n. 6, that reasoning is not relevant here.

***5** Additionally, New Jersey's "characterization of its own statute, while not dispositive because [the Court] is applying Minnesota law, is to be considered." *Nesladek,* 46 F.3d at 737 (citations omitted) (looking to the Nebraska courts' interpretation of a Nebraska statute, despite the fact that they had "yet to squarely hold *in a conflicts case* that [the Nebraska statute was] substantive rather than procedural law" (emphasis in original)). While it does not appear that New Jersey courts have squarely decided this issue, there is no indication that they would consider the New Jersey RICO Act procedural. [FN10] *See, e.g., Coyer v. Hemmer,* 901 F.Supp. 872, 882 (D.N.J.1995) (applying New Jersey choice of law rules in deciding to apply the New Jersey RICO Act, rather than Delaware law, without any consideration of whether the Act is substantive or procedural). Accordingly, both the Minnesota and New Jersey laws are substantive, which "means ... that [the Court does] not automatically apply Minnesota law."

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Nesladek, 46 F.3d at 738.

FN10. Likewise, there is no indication that other courts consider the New Jersey RICO Act procedural rather than substantive. *See, e .g.,* *Philadelphia Reserve Supply Co. v. Nowalk & Assocs., Inc.,* 864 F.Supp. 1456 (E.D.Pa.1994) (holding that claims under the New Jersey RICO Act were cognizable given the New Jersey state courts' interpretation of the Act, though not considering choice of law issues).

III. Contacts

The Court must next determine whether New Jersey's substantive law "can be constitutionally applied" in the present cases. *Jepson,* 513 N.W.2d at 469. This determination depends on the nature and number of contacts the state has to the facts of the case. *See* *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 821-22 (1985). As such, New Jersey "must have a significant contact or significant aggregation of contacts to the claims asserted by [Plaintiffs], contacts creating state interests, in order to ensure that the choice of [New Jersey] law is not arbitrary or unfair." *Id.* (internal quotations omitted).

Because New Jersey has a significant aggregation of contacts, its substantive law may be constitutionally applied. [FN11] Two of the defendants responsible for most of the planning and organization behind the transactions at issue, D'Angelo and Evangelista, live in and were working from New Jersey. Native Nations, the corporation through which all of the transactions passed, was a New Jersey corporation, as was D'Angelo's corporation, RBF. Moreover, the New Jersey contacts are directly related to the claims at issue here. *See* *Simon,* 124 F.Supp.2d at 70 (finding contacts with New York sufficient for constitutional standards, and emphasizing that the defendants' activities in New York "relat[ed] to the alleged conspiracy that led to plaintiff's damages"). The Court determines that the New Jersey RICO Act can be constitutionally applied to the instant actions.

FN11. Most of the defendants concede that constitutional standards permit the application of New Jersey substantive law to the instant cases. Though this is not dispositive in a constitutional analysis, it indicates the significance of the New Jersey contacts to these claims. At oral argument, however, the Nomura-related defendants (Nomura Securities International, Inc., Nomura Canada Inc. and Scott Reed) asserted that it would be unconstitutional to apply New Jersey law to FBW's claims against them. While they did not brief the issue in detail, they argue that their lack of physical contacts with New Jersey creates a constitutional problem. (*See* Nomura Mem. in Supp. at 11.) FBW asserts that the Nomura-related defendants were participants in a racketeering scheme that was largely centered in New Jersey. Given the nature of this allegation as necessarily involving various parties coordinating transactions from various locations, the application of the New Jersey RICO Act in such a situation does not violate the Constitution. (*See also infra,* section IV(D).)

IV. Choice of Law Analysis

Having determined that there is a conflict of law, the laws at issue are substantive, and that New Jersey law can be constitutionally applied, the Court "must now go forward and, applying Minnesota's choice of law rules, determine whether [New Jersey] or Minnesota law applies." [FN12] *Nesladek,* 46 F.3d at 738. Minnesota applies a "significant contacts test" for choice of law determinations. *Nodak Mut. Ins. v. Am. Family Mut.,* 604 N.W.2d 91, 94 (Minn.2000). This test requires the Court to consider five factors:

FN12. Decisions regarding choice of law are "made on an issue-by-issue, and not case-by case, basis." *Zaretsky,* 464 N.W .2d at 548. When considering choice of law, "[t]he search ... is not for the state whose law will be applied to govern all issues in a case; rather it is for the rule of law that can most appropriately be applied to govern the particular issue." *Ewing v. St. Louis-Clayton Orthopedic Group, Inc.,* 790 F.2d 682, 686 (8th Cir.1986) (internal quotation omitted). Thus, the choice of law "need not be the same as to every issue in a case." *Id.* at 687 (internal quotation omitted). That Plaintiffs assert claims based on another state's law is not determinative in the present analysis. While the Nomura-related defendants argue that FBW cannot assert both Minnesota state law claims and a New Jersey RICO claim, they fail to cite any authority supporting such a restriction, nor do they address the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

authority to the contrary. *See e.g., Smith v. Stonebridge Life Ins. Co.,* No. Civ. 03-1006 (RHK/AJB), 2003 WL 21909567, at *8 (D.Minn. Aug. 8, 2003) (choice of law determination regarding one claim does not control such a decision regarding any other claims in the same suit; it is only "after *first finding a conflict,* then engaging in a careful choice of law analysis," that the Court would come to a choice of law decision on any particular claim).

***6** (1) predictability of results; (2) maintenance of interstate and international order; (3) simplification of the judicial task; (4) advancement of the forum's governmental interest; and (5) application of the better rule of law.

*Id.* The Court will address each factor in turn, mindful that its "obligation is to be true to the method rather than to seek superficial factual analogies between cases and import wholesale the choice of law analysis contained therein." *Jepson,* 513 N.W.2d at 470.

A. Predictability of Results

Predictability of results "goes to whether the choice of law was predictable before the time of the transaction or event giving rise to the cause of action." *Nesladek,* 46 F.3d at 738. This factor "applies primarily to consensual transactions where the parties desire advance notice of which state law will govern in future disputes." *Myers v. Gov't Employees Ins. Co.,* 225 N.W.2d 238, 242 (Minn.1974). To the extent that it is applicable to the facts underlying the RICO claims, this factor weighs in favor of the application of New Jersey law, or is neutral. As for the defendants that are citizens of and conducted business from New Jersey (RBF, D'Angelo, and Evangelista), the application of New Jersey law was clearly predictable. As for the defendants that are not citizens of New Jersey (the Deutsche Bank entities and Breedon, El-Batrawi (Ultimate Holdings), the Nomura-related defendants (after March 2001), and Smith), the New Jersey residents were in direct contact with them. (*See, e.g.,* FBW Second Am. Compl. ¶ 65, 84.) Because these defendants were allegedly knowingly conducting illegal activity with companies and individuals located in New Jersey, the application of that State's RICO Act to claims against them was predictable.

B. Maintenance of Interstate and International Order

This factor is aimed at assessing whether the application of one state's law "would manifest disrespect for [another state's] sovereignty or impede the interstate movement of people and goods." *Jepson,* 513 N.W.2d at 471. The Court must also consider whether the application of one state's law over another encourages forum shopping. "Minnesota does not have an interest in encouraging forum shopping" *id.,* "because it frustrates the maintenance of interstate order," *Schumacher,* 676 N.W.2d at 691 (internal quotation omitted).

The application of New Jersey law would not promote forum shopping, whereas the application of Minnesota law could encourage such conduct. *See Smith v. Stonebridge Life Ins. Co.,* No. 03-1006 (RHK/AJB), 2003 WL 21909567, at *4 (D.Minn. Aug. 8, 2003) (finding plaintiffs were not forum shopping where they "filed their action in *Minnesota*-the very forum whose law Plaintiffs are trying to avoid" (emphasis in original)). If this Court applied Minnesota law to Plaintiffs' RICO claims, parties with similar claims may be tempted to file suit in New Jersey just to benefit from the advantages of that State's RICO Act.

***7** In addition, application of New Jersey law would show respect for New Jersey's public policy, as much of the alleged illegal activity occurred in and was coordinated through New Jersey. New Jersey's comparatively broad RICO Act demonstrates that the State places a premium on the eradication of such conduct. Furthermore, such application would not show disrespect for Minnesota's sovereignty or public policy because Minnesota's contact with the RICO claim is comparatively modest. *See, e.g., Hughes v. Wal-Mart Stores, Inc.,* 250 F.3d 618, 620 (8th Cir.2001) ("[This] factor is generally not implicated if the state whose law is to be applied has sufficient contacts with and interest in the facts and issues being litigated." (internal quotation omitted)).

C. Simplification of the Judicial Task

Consideration of this issue "has not been given much weight" under Minnesota's choice of law precedent. *Nodak,* 604 N.W.2d at 95. Moreover, "[a] federal district court is faced almost daily with the task of applying some state's law other than that of the forum state," making this factor of little consequence here. *Hughes,* 250 F.3d at 620.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

D. Advancement of the Forum's Governmental Interest

This factor requires the Court to consider "the relative policy interests of the two states." Nesladek, 46 F.3d at 739 (internal quotation omitted). It is also "designed to ensure that Minnesota courts do not have to apply rules of law that are inconsistent with Minnesota's concept of fairness and equity." Schumacher, 676 N.W.2d at 691 (internal quotation omitted). The Minnesota and New Jersey RICO Acts have the same basic policy goal-to eradicate illegal racketeering activities within the respective States. While the two statutes differ substantially in scope, the Court finds that this difference does not tip the scale in favor of applying Minnesota Law.

Minnesota's public policy regarding its RICO Act is not contrary to the application of harsh penalties as punishment for racketeering activity. *See, e.g.,* State v. Kujak, 639 N.W.2d 878, 883 (Minn.Ct.App.2002) (upholding $100,000 fine in addition to prison sentence for violation of the Minnesota RICO Act, and recognizing that "[t]he legislature clearly intended to punish severely those persons who engage in racketeering" (internal quotation omitted)). Moreover, Minnesota does not condemn the use of treble damages (or importing those damages from New Jersey). *See, e.g.,* Peterson v. BASF Corp., 675 N.W.2d 57, 64, 68 (Minn.2004) (upholding award of treble damages, prejudgment interest, and attorney's fees under New Jersey law, though declining to review choice of New Jersey law). As Minnesota does not have a policy against the application of harsh punishment for racketeering or treble damages generally, it is doubtful that its policy would disfavor compensation to a resident corporation and other parties injured by actions occurring in New Jersey.

***8** On the other hand, New Jersey's interest in these matters is significant. The acts largely giving rise to the RICO claims occurred in or emanated from New Jersey. [FN13] The types of acts that are subject to liability under a RICO Act will often involve active parties in various states. *See, e.g.,* *Environmental Tectonics v. W.S. Kirkpatrick, Inc.,* 847 F.2d 1052, 1063-64 (3d Cir.1988) (holding that plaintiff alleged a pattern of racketeering activity under the federal RICO Act, and by extension the New Jersey RICO Act, where plaintiff was injured in Pennsylvania, and defendants (located in New Jersey, Europe, Panama, and Nigeria) had, through their alleged scheme, injured the citizens of Nigeria and of the United States). Such is the case here, and the fact that Plaintiffs are not citizens of New Jersey is not controlling when the very nature of RICO activity tends to create a web of connections across borders and jurisdictions. *See also Fluck v. Jacobson Mach. Works, Inc.,* No. Civ. 98-1899, 1999 WL 153789, at *4 (Minn.Ct.App. March 23, 1999) (holding that Minnesota contacts and governmental interests outweighed those of Colorado in product liability action where plaintiff was resident of Colorado and injury occurred there, but product was manufactured in Minnesota by a Minnesota corporation).

FN13. The source of illegal activity is significant when considering the appropriate choice of law in securities cases. *See, e.g.,* *Gruber v. Price Waterhouse,* 117 F.R.D. 75, 82 (E.D.Pa.1987) (in securities class action, where only contacts outside Pennsylvania were that some class members resided and were injured in other states, the court found that "Pennsylvania [had] the most significant relationship particularly since the financial statements alleged to contain the misstatements emanated from Pennsylvania").

Defendants overlook the fact that, while none of the plaintiffs suffered injury in New Jersey, damage certainly occurred in that State due to the illegal activity of the New Jersey defendants (for example, Native Nations is currently subject to bankruptcy proceedings). Further, while some of the most significant damage that occurred from Defendants' actions took place in Minnesota, namely the destruction of MJK, the damage to all of the plaintiffs except for MJK occurred outside of Minnesota. [FN14] Defendants cite *Hughes* as support for the argument that the New Jersey claims should be dismissed because "New Jersey has no interest supporting application of its state RICO statute," while Minnesota's interest is substantial. (Deutsche Bank Mems. in Supp. at 11-12.) In *Hughes,* however, the court made clear that it was only "[a]bsent some relevant connection between a state and the facts underlying the litigation," that the state's interest in remedying injuries that occurred elsewhere would be lacking. 250 F.3d at 621. Here, there are numerous relevant connections between the facts underlying the RICO claims and New Jersey. Accordingly, it is clear that New Jersey's governmental interests would be furthered by the application of its RICO Act to the instant claims.

FN14. The Nomura-related defendants'

argument against the application of New Jersey law because Plaintiffs are not citizens of New Jersey, and their reliance on *Schimpf v. Gerald, Inc.,* 52 F.Supp.2d 976 (E.D.Wis.1999), is misplaced for this very reason. In *Schimpf,* the court found it significant that the plaintiffs were residents of and were injured in Wisconsin, and determined that Wisconsin law applied. *Id.* at 1003. In this case, Plaintiffs do not share a home state, nor do they share their place of injury; Plaintiffs do, however, have allegations of racketeering activity (largely centered in New Jersey) in common, making the application of New Jersey law all the more appealing.

E. Application of the Better Rule of Law

This factor has no bearing on this analysis, as the Minnesota courts have "not placed any emphasis on [it] in nearly 20 years." *Nodak,* 604 N.W.2d at 96. Further, the Eighth Circuit "has been especially hesitant to pronounce the better law when other ... factors point decidedly towards the application of one state's law." *Hughes,* 250 F.3d at 621, *citing Nesladek,* 46 F.3d at 740-41. As the foregoing discussion makes clear, the other choice-influencing factors favor New Jersey law, making consideration of this issue unnecessary.

Conclusion

*9 Based on the foregoing, and all of the files, records and proceedings herein, IT IS ORDERED:
1. The Motion by Deutsche Bank AG, **Deutsche Bank Securities**, Inc ., and **Deutsche Bank Securities** Limited to Dismiss Counts XII, XIII and XIV of Plaintiff Stephenson's Second Amended Corrected Complaint (Doc. No. 137) is DENIED;
2. The Motions by Wayne Breedon and Richard Evangelista for Joinder in Deutsche Bank's Partial Motion to Dismiss Plaintiff Stephenson's Second Amended Corrected Complaint (Doc. Nos.133, 150) are GRANTED;
3. The Motion by Deutsche Bank AG, **Deutsche Bank Securities**, Inc ., and **Deutsche Bank Securities** Limited to Dismiss Count XXIII of Plaintiff Ferris, Baker Watts, Inc.'s Second Amended Complaint (Doc. No. 344) is DENIED;
4. The Motions by Wayne Breedon and Richard Evangelista for Joinder in Deutsche Bank's Partial Motion to Dismiss Plaintiff Ferris, Baker Watts, Inc.'s Second Amended Complaint (Doc. Nos.347, 369) are GRANTED;
5. The Motion by James Smith to Dismiss Count XXIII of Plaintiff Ferris, Baker Watts, Inc.'s Second Amended Complaint (Doc. No. 360) is DENIED;
6. The Motion by Nomura Canada, Inc. and Scott Reed to Dismiss Count XXIII of Plaintiff Ferris, Baker Watts, Inc.'s Second Amended Complaint (Doc. No. 364) is DENIED;
7. The Motion by Nomura Securities International, Inc. to Dismiss Count XXIII of Plaintiff Ferris, Baker Watts, Inc.'s Second Amended Complaint (Doc. No. 368) is DENIED.

D.Minn.,2004.
Ferris, Baker Watts, Inc. v. Deutsche Bank Securities Ltd.
Not Reported in F.Supp.2d, 2004 WL 2501563 (D.Minn.), RICO Bus.Disp.Guide 10,768

Briefs and Other Related Documents (Back to top)

• 2005 WL 2604547 (Trial Motion, Memorandum and Affidavit) Plaintiff James Stephenson's Memorandum in Opposition to the Deutsche Bank Defendants' Motion to Preclude the Expert Testimony of Dr. Robert Comment (Sep. 01, 2005)
• 2005 WL 2604548 (Trial Motion, Memorandum and Affidavit) Plaintiff James P. Stephenson's Memorandum in Opposition to the Deutsche Bank Defendants' Motion to Preclude Certain Testimony By Mary D. Jepperson (Sep. 01, 2005)
• 2005 WL 2267083 (Trial Motion, Memorandum and Affidavit) Plaintiff James P. Stephenson'S Memorandum in Support of his Motion to Exclude Jeffrey L. Baliban'S Expert Testimony (Aug. 01, 2005)
• 2005 WL 2266812 (Trial Motion, Memorandum and Affidavit) Synopsis of Memorandum of Law in Support of the Motion of Defendants Nomura Canada Inc. and Scott Reed for Summary Judgment (Jul. 22, 2005)
• 2005 WL 2267281 (Trial Motion, Memorandum and Affidavit) Synopsis of Defendant Wayne Breedon's Memorandum of Law in Support of his Omnibus Motion for Partial Summary Judgment (Jul. 22, 2005)
• 2005 WL 2267282 (Trial Motion, Memorandum and Affidavit) Synopsis of Defendant Wayne Breedon's Reply Memorandum of Law in Further Support of his Omnibus Motion for Partial Summary Judgment (Jul. 22, 2005)
• 2005 WL 2267301 (Trial Motion, Memorandum and Affidavit) Synopsis of Defendant Wayne Breedon's Memorandum of Law in Support of his

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Omnibus Motion for Partial Summary Judgment (Jul. 22, 2005)
• 2005 WL 2266830 (Trial Motion, Memorandum and Affidavit) Wedbush Morgan Securities, Inc.'s Reply Memorandum of Law in Support of its Motion for Summary Judgment as to the Third Party Claims of Deutsche Bank AG, Deutsche Bank Securities, Inc. and Deutsche Bank Securities Limited (Jul. 15, 2005)
• 2005 WL 2267156 (Trial Motion, Memorandum and Affidavit) Defendant Wayne Breedon's Reply Memorandum of Law in Further Support of his Omnibus Motion for Partial Summary Judgment (Jul. 15, 2005)
• 2005 WL 1585004 (Trial Motion, Memorandum and Affidavit) Wedbush Morgan Securities, Inc.'s Memorandum of Law in Support of its Motion to Consolidate Actions for Trial (Jun. 15, 2005)
• 2005 WL 1584996 (Trial Motion, Memorandum and Affidavit) Defendant Wayne Breedon's Memorandum of Law in Support of His Omnibus Motion for Partial Summary Judgment (May. 31, 2005)
• 2005 WL 1585017 (Trial Motion, Memorandum and Affidavit) Defendant Wayne Breedon's Memorandum of Law in Support of his Omnibus Motion for Partial Summary Judgment (May. 31, 2005)
• 0:02cv04845 (Docket) (Dec. 19, 2002)
• 0:02cv03682 (Docket) (Sep. 20, 2002)
• 2002 WL 32882371 (Trial Motion, Memorandum and Affidavit) Defendant Wayne Breedon's Reply Memorandum of Law in Further Support of his Omnibus Motion for Partial Summary Judgment (Jan. 01, 2002)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT E

**UNPUBLISHED DECISION**

**Children's Broadcasting Corp. v. The Walt Disney Company,**

2002 WL 1858759 (D. Minn. Aug. 12, 2002)

Westlaw.



Briefs and Other Related Documents

Only the Westlaw citation is currently available.

United States District Court, D. Minnesota.

CHILDREN'S BROADCASTING CORPORATION, a Minnesota corporation, Plaintiff,

v.

THE WALT DISNEY COMPANY, a Delaware corporation, and ABC Radio Networks, Inc., a Delaware corporation, Defendants.

**No. Civ.3-96-907 ADM/AJB.**

Aug. 12, 2002.

Thomas F. Cullen, Jr., Adrian Wager-Zito, and Kevin C. Maclay, Jones, Day, Reavis & Pogue, Washington, D.C., and Richard G. Mark, Briggs & Morgan, Minneapolis, MN, on behalf of Plaintiff.

Paul B. Klaas, and Steven J. Wells, Dorsey & Whitney, Minneapolis, MN, on behalf of Defendants.

MEMORANDUM OPINION AND ORDER

MONTGOMERY, J.

I. INTRODUCTION

***1** On June 20, 2002, the undersigned United States District Judge heard post-trial motions by Defendants Walt Disney Company ("Disney") and ABC Radio Networks, Inc. ("ABC Radio") (collectively, "Defendants"), and Children's Broadcasting Corporation ("Children's"). Defendants presented their Motion for Judgment as a Matter of Law, or in the alternative, for New Trial [Doc. No. 569]. Children's argued its Motion for Entry of Judgment, which it claims should include prejudgment interest and exemplary damages. For the reasons set forth below, Defendants' Motion is denied and judgment will be entered as specified herein.

II. BACKGROUND

This is a case of long duration. Children's brought this suit on September 26, 1996, alleging many claims. All but three claims were terminated by summary judgment. The three remaining claims, breach of contract for failure to use reasonable efforts to sell advertising and develop affiliates, breach of the contractual duty of confidentiality, and misappropriation of trade secrets, were tried to a jury in a three-week-long trial in September, 1998. The jury found that ABC Radio breached the contract with respect to advertising sales and confidentiality, and awarded $20 million to Children's for this breach. [FN1] The jury also found that ABC Radio and Disney had misappropriated Children's trade secret, a list of Children's advertisers and their rates, and awarded Children's $10 million from ABC Radio and $10 million from Disney on this claim.

FN1. The jury rejected Children's claim that ABC Radio breached the contract provision for affiliate development.

ABC Radio and Disney moved for judgment as a matter of law or, in the alternative, a new trial. Judge Donald D. Alsop, the presiding judge in the first trial, granted judgment as a matter of law to ABC Radio and Disney, concluding that although the evidence supported the jury's finding that ABC Radio breached the contract and that ABC Radio and Disney misappropriated the advertiser list, Children's had failed to present sufficient evidence of causation or damages. The court also determined that the testimony of Stephen Willis, one of Children's experts, should have been excluded and the admission of his testimony tainted the jury. [FN2]

FN2. Willis testified that Children's damages were $177 million.

The Eighth Circuit reversed the judgment as a matter of law and remanded for a new trial limited to damages. *Children's Broadcasting Corp. v. The Walt Disney Co.,* 245 F.3d 1008, 1022 (8th Cir.2000). The evidence was found sufficient to support the jury's finding that the breach of contract and the

EXHIBIT
E
tabbies

© 20 to Orig. U.S. Govt. Works.

misappropriation of the advertiser list caused harm to Children's and that ABC Radio and Disney were not entitled to judgment as a matter of law on causation. *Id.* at 1016. The Eighth Circuit also determined there was evidence from which the jury could assess the amount of damages sustained by Children's, and therefore held that ABC Radio and Disney were not entitled to judgment as a matter of law on damages. *Id.* at 1017. Nevertheless, the Eighth Circuit held that the district court did not abuse its discretion by granting a new trial based upon the taint caused by Willis' testimony, which gave the jury an inflated, unrealistic measure of damages. *Id.* at 1018-19. The case was remanded for a new trial.

***2** Beginning April 29, 2002, this Court retried the case limited to the issue of damages. The trial lasted eight days. The jury deliberated for a day and a half and awarded Children's $1.5 million for breach of contract by failing to use reasonable efforts to sell advertising for Radio AAHS, and $8.0 million for breach of the contractual duty to maintain the confidentiality of PX 217 and misappropriation of PX 217. [FN3] For purposes of their Motion for Judgment as a Matter of Law, Defendants challenge only the $8.0 million award for breach of confidentiality and misappropriation of PX 217.

FN3. Plaintiff's Exhibit # 217 ("PX 217") is Children's trade secret, a list of Children's advertisers and their rates.

## III. DISCUSSION

### A. Motion for Judgment as a Matter of Law

At the close of Children's case-in-chief, Defendants moved for judgment as a matter of law. *See* Fed.R.Civ.P. 50(a)(2) ("Motions for judgment as a matter of law may be made at any time before submission of the case to the jury."). The motion was denied. When a "court does not grant a motion for judgment as a matter of law made at the close of all the evidence, the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion." Fed.R.Civ.P. 50(b); *see also* *Peerless Corp. v. United States,* 185 F.3d 922, 926 (8th Cir.1999). Defendants now renew their Motion for Judgment as a Matter of Law. *See* Fed.R.Civ.P. 50(b) ("[A] movant may renew its request for judgment as a matter of law [and] may alternatively request a new trial.").

Judgment as a matter of law is appropriate only when there is insufficient evidence to permit a reasonable jury to find in favor of the nonmoving party. *Gardner v. Buerger,* 82 F.3d 248, 251 (8th Cir.1996). The facts must be viewed in the light most favorable to the verdict, assuming that the jury resolved all evidentiary conflicts in favor of the prevailing party. *Van Steenburgh v. Rival Co.,* 171 F.3d 1155, 1158 (8th Cir.1999). The Court will "not weigh, evaluate, or consider the credibility of the evidence." *Triton Corp. v. Hardrives, Inc.,* 85 F.3d 343, 345 (8th Cir.1996). A jury's verdict should not be overturned unless no reasonable juror could have found in favor of the prevailing party. *Van Steenburgh v. Rival Co.,* 171 F.3d 1155, 1158 (8th Cir.1999); *Ryther v. KARE 11,* 108 F.3d 832, 836 (8th Cir.1997).

The pivotal question is whether the jury's verdict, specifically the $8.0 million award for breach of confidentiality and misappropriation of PX 217, should be overturned because no reasonable juror could have reached it. "Under Minnesota law, damages for breach of contract must be proved to a reasonable certainty, and a party cannot recover speculative, remote, or conjectural damages." *Children's,* 245 F.3d at 1016 (citing *Leoni v. Bemis Co.,* 255 N.W.2d 824, 826 (Minn.1977)). "Once the fact of loss has been shown, the difficulty of proving its amount will not preclude recovery so long as there is proof of a reasonable basis upon which to approximate the amount." *Id.* "The jury's award does not have to match any particular figure in the evidence as long as the award 'is within the mathematical limitations established by the various witnesses and is otherwise reasonably supported by the evidence as a whole." ' *Id.* (quoting *Carrol v. Pratt,* 247 Minn. 198, 76 N.W.2d 693, 697 (Minn.1956)).

***3** Evidence was presented to the jury which would permit reasonable jurors to award Children's damages in the amount of $8.0 million for breach of the contractual duty to maintain the confidentiality of, and misappropriation of, PX 217. There was evidence indicating that PX 217 possessed value. ABC Radio specifically requested the information in PX 217 from Children's. *See* Trial Tr. (5/02/02) Vol. IV at 71-72; Pl.Ex. 200 (Senior Management Review); Pl.Ex. 310 (planning document for Radio Disney). Jim Gilbertson testified that PX 217 would be "useful" to a competitor. Trial Tr. (5/02/02) Vol. IV at 72-73. Rick Smith testified that PX 217 was valuable. Trial Tr. (4/30/02) Vol. II at 158-60.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Children's presented evidence that ABC Radio and Disney were able "to accelerate their entry into the market by using information, particularly information about advertising and marketing, they obtained from Children's." Children's, 245 F.3d at 1016. The damages jury approximated the value of that acceleration gain to Defendants, as well as the value of the removal of competitive uncertainty and risk. Evidence indicated that ABC Radio viewed its relationship with Children's as one of "competitive control ... we can take control of how we enter or CBC exits the market." Pl.Ex. 138. ABC Radio planned that "Radio Disney Network Spots Will Be Priced Agressively Versus AAHS." Pl.Ex. 532. During the planning of Radio Disney, PX 217 appears in a draft "deck" dated April 24, 1996. Pl.Ex. 310. Jurors are entitled to draw reasonable inferences from the facts established during the testimony.

In June, 1996, Defendants estimated the value of the Radio Disney opportunity at approximately $270 million. *See* Pl.Ex. 362 at 1007250; Pl.Ex. 456 at 1012987. Radio Disney's projected advertising revenue for 1998 was approximately $8 million. Pl.Ex. 362. Evidence showed that Disney views Radio Disney as "tremendously successful" and a success "by any measure." Trial Tr. (5/06/02) Vol. VI at 229; Pl.Ex. 941. There were reasonable bases upon which jurors could approximate the gain to Defendants and award $8.0 million in damages to Children's.

Dr. Jonathan Putnam also presented evidence of damages measured at a range of time intervals. The jury was entitled to use Dr. Putnam's expert testimony as a guide in their deliberations, or to disregard his opinions. Jury Instruction Number 8 provided:

You should consider each expert opinion received in evidence in this case, and give it such weight as you may think it deserves. If you should decide that the opinion of an expert witness is not based upon sufficient education and experience, or if you should conclude that the reasons given in support of the opinion are not sound, or if you feel that it is outweighed by other evidence, you may disregard the opinion entirely.

Dr. Putnam was permitted to testify as an expert after satisfying the court that he possessed significant credentials for valuing a trade secret and employed an accepted academic methodology in arriving at his conclusions. Dr. Putnam's testimony was relevant and his methodology was reliable. *See* *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 141-42, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). Defendants' objections to Dr. Putnam's testimony are better directed to the issue of the weight to be given to the testimony rather than its admissibility. Trial Tr. (5/03/02) Vol. V at 38. Moreover, Defendants received a full opportunity to cross-examine Dr. Putnam and could have presented rebuttal expert testimony.

***4** Just as the Eighth Circuit found that there was evidence at the first trial from which the jury could approximate the amount of damages sustained by Children's, [FN4] this Court finds there was sufficient evidence in the retrial on damages from which the jury could approximate the amount of damages endured by Children's at $8.0 million. "The jury's award does not have to match any particular figure in the evidence." *Children's,* 245 F.3d at 1017. ABC Radio and Disney are not entitled to judgment as a matter of law.

FN4. *Children's,* 245 F.3d at 1017 (holding that Defendants were not entitled to judgment as a matter of law on damages).

B. Motion for a New Trial

Defendants also raise a Motion for a New Trial. *See* Fed.R.Civ.P. 50(b)(1)(B); Fed.R.Civ.P. 59(a). Motions for a new trial are committed to the discretion of the district court. *See* *McDonough Power Equip. v. Greenwood,* 464 U.S. 548, 556, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984). A denial of a motion for a new trial based on the sufficiency of the evidence is "virtually unassailable on appeal" and is disturbed only upon a finding of a clear abuse of discretion. *Czajka v. Black,* 901 F.2d 1484, 1485 (8th Cir.1990). A court may not grant a motion for a new trial unless the verdict is against the great weight of the evidence and a new trial is necessary to prevent a miscarriage of justice. *See* *Denesha v. Farmers Ins. Exch.,* 161 F.3d 491, 497 (8th Cir.1998); *Iowa-Mo Enterprises, Inc. v. Avren,* 639 F.2d 443, 452 (8th Cir.1981) (stating that a "jury verdict will be reviewed only to determine whether the damages award constitutes 'plain injustice,' is 'monstrous,' or produced a 'shocking' result"). A court should grant a new trial only if it finds that an error "misled the jury or had a probable effect on its verdict." *E.I. Du Pont de Nemours v. Berkley & Co.,* 620 F.2d 1247, 1257 (8th Cir.1980). A court may not usurp the role of the jury by granting a new trial simply because it believes other inferences and conclusions are more reasonable. *White v. Pence,* 961 F.2d 776, 780-81 (8th Cir.1992).

Defendants' Motion for a New Trial is denied. This

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Court has reviewed the evidence and its evidentiary rulings and concludes that a new trial is not warranted. As discussed above, substantial evidence supports the jury's award.

Furthermore, Defendants' proposed jury instructions were properly denied. Defendants requested several instructions addressing the absence of a special relationship, the lack of fiduciary duties, the absence of fraud, and the purpose of the contract. These topics were irrelevant in the retrial limited to damages. The Court attempted to narrowly define the questions for the second jury, and cautioned in Jury Instruction Number 14:

The November 17, 1995, contract between Children's and ABC did not restrict ABC and Disney's right to compete against Children's. The establishment of Radio Disney cannot be considered wrongful conduct.

ABC did not breach any other provision of the contract with Children's other than the duty to use reasonable efforts to sell advertising and the duty of confidentiality with respect to Plaintiff's Exhibit # 217. Any other claims for breach of contract or other wrongdoing were rejected by the first jury.

***5** Defendants also argue that the second jury should have been instructed about the first jury's finding of "non-material" breach. The Eighth Circuit noted, "[t]he verdict form included the question of whether ABC Radio's breach was material because Children's owed $91,000 under the contract. If the jury found the breach to be material, Children's performance (and thus the payment) would be excused." 245 F.3d at 1014 n. 1. Whether the breach was "material" or "non-material" was irrelevant in the retrial on damages because materiality is only relevant to the question of CBC's right to suspend performance. In order for a breach to justify the injured party's suspension of performance, the breach must be significant enough to amount to the nonoccurrence of a constructive condition of exchange; such a breach is termed "material." Farnsworth on Contracts 8.16 (2d ed.1998). An immaterial breach does not amount to the nonoccurrence of a constructive condition of exchange, so the injured party is not entitled to suspend performance, though it may claim damages for partial breach. *Id.* A breach is less likely to be characterized as material where the breach may be paid for in damages. *Id.* (citing *Boone v. Eyre,* 126 Eng. Rep. 160(a) (K.B.1777) (holding that a party may have remedy in damages)). The question of CBC's right to suspend performance, and withhold payment of the $91,000, was not at issue in the retrial limited to damages. [FN5] The first jury's finding on materiality shared the same fate as its damages findings of $20 million, $10 million, and $10 million. None of these findings from the first trial were disclosed to the retrial on damages jury.

FN5. Judge Alsop entered judgment after the first trial without addressing Defendants' counterclaim. Defendants did not appeal the disposition of the counterclaim.

C. Prejudgment Interest

Children's seeks prejudgment interest. In Minnesota, both statute and common law govern the award of prejudgment interest. *See* Minn.Stat. § 549.09; *Potter v. Hartzell Propeller, Inc.,* 291 Minn. 513, 189 N.W.2d 499, 504 (Minn.1971). Section 549.09 provides that the prevailing plaintiff is entitled to preverdict interest on pecuniary damages computed from the time of the commencement of the action, except as otherwise provided by contract or allowed by law. Minn.Stat. § 549.09, subd. 1(b). The statute is clear: the prevailing party "shall receive interest" on any award, with a few limited exceptions. *Id.*

Defendants argue that Children's award in this case falls within the exception for future damages. *See* Minn.Stat. 549.09, subd. 1(b)(2) ("interest shall not be awarded on ... awards for future damages"). However, there were no future damages awarded in this case. Jury Instruction Number 16 instructed that "damages for breach of the contract must be limited to those suffered on or before October 24, 1996." Children's presented evidence, such as the discounted cash flow model, to help the jurors calculate the net present value of its damages. The future damages exception to prejudgment interest does not apply here.

***6** Defendants also contend that Children's failure to keep its settlement offer open for 30 days bars Children's from receiving prejudgment interest. Section 549.09 "does not require either party to make a settlement offer or respond to an offer made by the other party." *Trapp v. Hancuh,* 587 N.W.2d 61, 64 (Minn.1998). Parties *may* make offers and, if a party makes an offer, the statute provides a time period for the other party to accept or reply with a counteroffer. [FN6] The statute additionally provides a mechanism for the court to determine which of the parties' offers should be used in calculating prejudgment interest. *Id.* The statute does not require a settlement offer to be made and held open for 30 days as a prerequisite

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

for receiving prejudgment interest.

FN6. The statute reads in pertinent part: "*If* either party serves a written offer of settlement, the other party *may* serve a written acceptance or a written counteroffer within 30 days." Minn.Stat. 549.09, subd. 1(b) (emphasis added).

Defendants further argue that Children's should not receive prejudgment interest because the damages were not readily ascertainable. This argument is unsupported by the case law. The Eighth Circuit observed that § 549.09 allows prejudgment interest "irrespective of a defendant's ability to ascertain the amount of damages for which [it] might be held liable." *Simeone v. First Bank Nat'l Ass'n,* 73 F.3d 184, 191 (8th Cir.1996) (quoting *Lienhard v. State,* 431 N.W.2d 861, 865 (Minn.1988)). A mere difference of opinion as to the exact amount of damages is insufficient to excuse a defendant from compensating a plaintiff for loss of the use of its money. *Id.* (citing *Solid Gold Realty, Inc. v. Mondry,* 399 N.W.2d 681, 684 (Minn.App.1987)); *see also Myers v. Hearth Tech., Inc.,* 621 N.W.2d 787, 794 (Minn.App.2001) ("preverdict interest is available irrespective of a defendant's ability to ascertain the amount of damages").

Children's is entitled to prejudgment interest under Minnesota statute. The prejudgment interest is computed as simple interest per annum, based on a bank-discounted secondary market yield of one-year U.S. treasury bills. Minn.Stat. 549.09, subd. 1(c). The applicable annual rates were five percent in 1996, 1997, 1998; four percent in 1999; five percent in 2000; six percent in 2001, and two percent in 2002. *See* Minn.Stat. § 549.09, Statutory Notes (2002). The total verdict award was $9.5 million. Children's is entitled to interest for the period from September 26, 1996, to May 10, 2002. The total amount of prejudgment interest to which Children's is entitled is $2,567,082.19. FN7

FN7. Table calculating the interest:

| Year | | | Rate | |
|---|---|---|---|---|
| 1996 | $ | 124,931.51 | 0.05 | 97 days |
| 1997 | $ | 475,000.00 | 0.05 | |
| 1998 | $ | 475,000.00 | 0.05 | |
| 1999 | $ | 380,000.00 | 0.04 | |
| 2000 | $ | 475,000.00 | 0.05 | |
| 2001 | $ | 570,000.00 | 0.06 | |
| 2002 | $ | 67,150.68 | 0.02 | 129 days |
| | $ | 2,567,082.19 | | |

D. Exemplary Damages

Children's asks for exemplary damages based on Defendants' "willful and malicious" conduct. However, there was not a finding of "willful and malicious" conduct by the first jury. The remand from the Eighth Circuit was for a "new trial limited to damages." *Children's,* 245 F.3d at 1022. The issue of whether Defendants' conduct rose to the level of "willfulness and maliciousness" is a liability question and beyond the scope of the limited remand. Such a determination would necessarily concern the nature of Defendants' conduct and go beyond the evaluation of damages. This Court heard insufficient evidence to support a finding of "willful and malicious" conduct. Children's request for exemplary damages is denied.

IV. CONCLUSION

*7 Based upon the foregoing, and all of the files, records and proceedings herein, IT IS HEREBY ORDERED that:
(1) Defendants' Motion for Judgment as a Matter of Law, or in the alternative, for New Trial [Doc. No. 569] is DENIED;
(2) Plaintiff's Motion to Enter Judgment is GRANTED and judgment is entered on the jury verdict award totaling $9.5 million; FN8

FN8. This sum is reached by adding the $1.5 million for breach of contract by failing to use reasonable efforts to sell advertising for Radio AAHS and the $8.0 million for breach of the contractual duty to maintain the confidentiality of PX 217 and misappropriation of PX 217.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(3) Plaintiff is awarded $2,567,082.19 in prejudgment interest; and
(4) Plaintiff's request for exemplary damages is DENIED.

LET JUDGMENT BE ENTERED ACCORDINGLY.

D.Minn.,2002.
Children's Broadcasting Corporation v. Walt Disney Co.
Not Reported in F.Supp.2d, 2002 WL 1858759 (D.Minn.)

Briefs and Other Related Documents (Back to top)

- 1997 WL 33823641 (Trial Pleading) Separate Answer of Disney Enterprises, Inc. Formerly Named "The Walt Disney Company" to First Amended Complaint (Sep. 24, 1997)
- 1997 WL 33823642 (Trial Pleading) Separate Answer and Counterclaim of Abc Radio Networks. Inc. to First Amended Complaint (Sep. 24, 1997)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.